IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**CENTER FOR ARIZONA POLICY INC. ET AL.,**
*Plaintiffs/Appellants,*


*v.*


**ARIZONA SECRETARY OF STATE, ET AL.,**
*Defendants/Appellees,*

**KRISTIN MAYES, ARIZONA ATTORNEY GENERAL, ET AL.,**
*Intervenors/Appellees.*

---

No.   CV-24-0295-PR
**Filed June 29, 2026**

---

Appeal from the Superior Court in Maricopa County
The Honorable M. Scott McCoy, Judge
No. CV2022-016564

**AFFIRMED IN PART, REVERSED IN PART, REMANDED**

---

Opinion of the Court of Appeals,
Division One
258 Ariz. 570 (App. 2024)

**VACATED IN PART**

---

COUNSEL:

Andrew Gould (argued), Emily Gould, Daniel Tilleman, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Phoenix; Jonathan Riches, Timothy Sandefur, Scott Day Freeman, Parker D. Jackson, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Attorneys for Center for Arizona Policy, Inc., et al.

Kristin K. Mayes, Arizona Attorney General, Alexander W. Samuels (argued), Nathan T. Arrowsmith, Kathryn E. Boughton, Assistant Attorneys General, Phoenix, Attorneys for Arizona Attorney General

Luke A. Douglas, Katharine Myers, Office of the Secretary of State, Phoenix, Attorneys for Arizona Secretary of State

Jared G. Keenan, Arizona Center for Law in the Public Interest, Phoenix; David Kolker, Tara Malloy, Elizabeth D. Shimek, Campaign Legal Center, Washington, D.C., Attorneys for Voters' Right to Know

Mary R. O'Grady, Eric M. Fraser (argued), Alexandria N. Karpurk, Osborn Maledon, P.A., Phoenix, Attorneys for Arizona Citizens Clean Elections Commission

Brett W. Johnson, Tracy A. Olson, Ryan P. Hogan, Charlene A. Warner, Snell & Willmer L.L.P., Phoenix, Attorneys for Amici Curiae Speaker of the House Steve Montenegro and President of the Senate Warren Petersen

Joy E. Herr-Cardillo, Associate Clinical Professor of Law, The University of Arizona James E. Rogers College of Law, Tucson, Attorneys for Amicus Curiae John D. Leshy

Aaron T. Martin, Martin Law & Mediation PLLC, Phoenix; Brett R. Nolan, Institute for Free Speech, Washington, D.C., Attorneys for Amicus Curiae Institute for Free Speech

Susan M. Freeman, Kory J. Koerperich, Womble Bond Dickinson (US) LLP, Phoenix, Attorneys for Amicus Curiae Citizens for Responsibility and Ethics in Washington

Timothy J. Berg, Emily Ward, Fennemore Craig, P.C., Phoenix, Attorneys for Amici Curiae Fife Symington, Vernon Parker and Bob Burns

Jon Weiss, Lindsey Huang, Papetti Samuels Weiss McKirgan LLP, Scottsdale, Attorneys for Amici Curiae Legal Scholars

Grant H. Frazier, Evan G. Daniels, Frazier Law, PLLC, Scottsdale; Robert Alt, David C. Tryon, The Buckeye Institute, Columbus, OH, Attorneys for Amicus Curiae The Buckeye Institute

Dominic E. Draye, Greenberg Traurig, LLP, Phoenix; Derek Shaffer, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, D.C., Attorneys for Amici Curiae Americans for Prosperity & Americans for Prosperity Foundation

Julie Kriegh, City Attorney, Deryck R. Lavelle, Chief Assistant City Attorney, Dustin Cammack, Assistant City Attorney, Phoenix, Attorneys for Amicus Curiae City of Phoenix

Alex Kaufman, Chalmers, Adams, Backer & Kaufman LLC, Alpharetta, GA, Attorneys for Amici Curiae Make Liberty Win and Young Americans for Liberty

Michael G. Bailey, Arizona Chamber of Commerce & Industry, Phoenix, Attorneys for Amicus Curiae Arizona Chamber of Commerce & Industry

-----

CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which JUSTICES BEENE, MONTGOMERY, and BERCH (ret.),[*] joined. JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and JUSTICE BOLICK, concurred in part and dissented in part.

-----

CHIEF JUSTICE TIMMER, Opinion of the Court:

¶1        In November 2022, Arizona voters enacted the Voters' Right to Know Act (the "Act"). *See* Voters' Right to Know Act, Proposition 211 (2022) (hereinafter "Prop. 211"). The Act declares that "the People of Arizona have the right to know the original source of all major contributions used to pay, in whole or part, for campaign media spending." *Id.* § 2(A). To accomplish this goal, the Act requires public disclosure of major donors who fund election-related public communications during an election cycle and the original sources of their contributions, even when those contributions move through intermediaries. *Id.* The Act reflects an

-----

[*]   Justice Maria Elena Cruz is recused from this matter. Pursuant to article 6, section 3 of the Arizona Constitution, Justice Rebecca Berch (retired) of the Arizona Supreme Court is designated to sit in this matter until it is finally decided.

intent "to stop 'dark money,' the practice of laundering political contributions, often through multiple intermediaries, to hide the original source." *Id.* § 2(C).

¶2           Plaintiffs, two organizations and two individuals, sued to challenge the Act's constitutionality.   The superior court dismissed their complaint for failing to state legally valid claims.   The issues here are whether Plaintiffs alleged legally viable claims that the Act is facially unconstitutional or, in the alternative, is unconstitutional as applied to them.   We hold that Plaintiffs failed to sufficiently allege that the Act is facially unconstitutional.   Plaintiffs likewise failed to sufficiently allege that the Act is unconstitutional as applied to them under the Arizona Constitution's privacy provision.   The superior court therefore correctly dismissed all those claims.   But because the Plaintiffs sufficiently alleged at this very early stage that the Act is unconstitutional as applied to them under the Arizona Constitution's free-speech provision, the court erred by dismissing that claim.

## BACKGROUND

### A.   Overview of the Act

¶3           Given the Act's complexity, we summarize only the provisions relevant here.   To begin, the Act does not require disclosure of direct contributors to candidates, candidate committees or, with one exception not relevant here, political action committees or political parties. *See* A.R.S. § 16-971(2), (7).[1]   Nor does it regulate campaign media spending

---

[1]   Other laws outside the Act already require disclosures from these persons and entities.   A.R.S. § 16-906(B)(1)(b) requires political action committees (entities organized for the primary purpose of influencing an election and who receive contributions or make expenditures in connection with the election, *see* A.R.S. § 16-905(C)) to disclose the name and address of any sponsor and incorporate sponsors into their committee names. Those names, in turn, must be disclosed on campaign advertisements and solicitations.   *See* A.R.S. § 16-925(A)–(D).   A.R.S. § 16-926(B)(2) requires candidate committees, political action committees, and political parties to disclose the identities of contributors, including for individual contributors, their occupations, and employers.   A.R.S. § 16-925 requires entities paying for an advertisement or fundraising solicitation to disclose their identities

4

directly funded by individuals or organizations using their own money. *See id.* Instead, the Act applies to "covered persons" who act independently of a particular candidate or ballot measure sponsor but accept donations and use them to fund election-related media.[2] *See* A.R.S. §§ 16-972 through 16-973.

**¶4** A "covered person" is one who, within a single election cycle, spends more than $50,000 on campaign media for statewide campaigns or more than $25,000 on other campaigns; accepts in-kind contributions used for campaign media spending in those amounts; or meets those thresholds through a combination of both. *See* A.R.S. § 16-971(7). We refer to these requirements collectively as the "Spending Threshold." The Spending Threshold applies only to "campaign media spending," which the Act defines as expenditures for public communications related to elections for candidates, initiatives and referenda, or the recall of public officers. *See* A.R.S. § 16-971(2).

**¶5** The Act includes an opt-out provision designed to protect donor choice. A covered person must notify donors, either before or after receiving a contribution, that the contribution may be used for campaign media spending and, if so used, may be subject to disclosure. *See* § 16-972(B)–(C). As the dissent notes, the Act does not require the covered person to identify the precise substance of any proposed campaign media. *See infra* ¶ 185. But the donor is free to ask further questions or to refuse to allow the contribution to be used for campaign media. A covered person may not use a contribution for campaign media spending until twenty-one days after providing that notice, unless the donor provides written consent sooner, which could occur at the time the contribution is solicited or made. *See* § 16-972(C). Contributions used for campaign media spending after this notice-and-choice process constitute what the Act defines as "traceable monies." *See* § 16-971(18). Conversely, donors who opt out are assured that their contributions will not be used to fund campaign media spending. *See* § 16-972(B). The Act thus does not

---

in the advertisement or solicitation. A.R.S. § 19-111(A) requires those proposing an initiative or referendum to disclose their names and addresses and if an organization, the names and titles of officers. The constitutionality of these provisions is not before us.

[2] The Act defines "person" as including both natural persons and entities. § 16-971(13).

compel donors to finance campaign media or to associate with election-related messaging they do not support; it preserves donors' control over whether their contributions will be used for that purpose.

¶6          Once a covered person reaches the Spending Threshold during an election cycle, and again as new thresholds are met, disclosure reports must be filed with the Secretary of State.  *See* § 16-973.  Relevant here, these reports must identify each donor who contributed more than $5,000 in traceable monies or in-kind contributions to the covered person during the election cycle, whether directly or through an intermediary.  *See* § 16-973(A)(6).  The reports must also identify any intermediary who transferred more than $5,000 in traceable monies from original sources to the covered person.  *See* § 16-973(A)(7).  In short, the Act requires disclosure of the original sources of traceable monies used for campaign media spending, not merely the immediate donors.  Contributions below $5,000, however, are exempt from disclosure.  § 16-973(G).  Notwithstanding the disclosure provisions, the identity of donors will not be disclosed if that identity is protected by law or court order, or a "reasonable probability" exists that public knowledge of the donor's identity would subject the donor or the donor's family to "a serious risk of physical harm."  § 16-973(F).

¶7          Covered persons must also maintain "transfer records" identifying those who directly or indirectly contributed or transferred more than $2,500 of "original monies" (defined as personal monies or business income) ultimately used for campaign media spending.  *See* §§ 16-971(12), (19), -972(A).  The records must include the amounts contributed or transferred and the recipient of those monies.  *See* § 16-971(19).  Covered persons must keep these records for five years and provide them to the Citizens Clean Elections Commission (the "Commission") upon request.  *See* § 16-972(A).  Presumably, these records are kept to track donations and identify donors who contribute in the aggregate more than $5,000 in traceable monies.

¶8          In addition, donors of more than $5,000 in traceable monies or in-kind contributions must disclose the original sources of any funds over $2,500 that made their contributions possible.  *See* § 16-972(D)–(E).  Specifically, donors must identify each person who provided more than $2,500 of the funds used, the amounts provided, and any intermediaries who transferred those funds.  *See id.*  Donors who make in-kind contributions must provide this information to covered persons at the time

the contribution is made or promised to be made. *See* § 16-972(E). But notably, and curiously, donors of traceable monies are only required to disclose that information upon the covered person's written request, and nothing expressly requires covered persons to make that request. *See* § 16-972(D). All donors must maintain records of this information for five years and provide them to the Commission upon request. *See* § 16-972(D)–(E).

**¶9** The Act also empowers the Commission to implement and enforce its provisions. *See* A.R.S. § 16-974(A). Among other duties, the Commission must "establish disclaimer requirements for public communications by covered persons," which must include, at a minimum, disclosure of the names of the top three donors of original monies during the election cycle. § 16-974(C).

**¶10** Finally, the Act imposes civil penalties for failure to comply with its provisions. *See* A.R.S. § 16-976(A). It does not impose criminal sanctions for any violations.

## B. These Proceedings

**¶11** Plaintiffs are two anonymous individuals who donate to organizations engaged in campaign media spending, and two nonprofit organizations, the Center for Arizona Policy, Inc. ("CAP") and the Arizona Free Enterprise Club ("FEC"), both of which we assume qualify this election cycle as covered persons under the Act. Both CAP and FEC engage in research, education, and advocacy. CAP addresses issues affecting "foundational principles of life, marriage, family, and religious freedom," while FEC focuses on free enterprise, limited government, and pro-growth public policies.

**¶12** In late 2022, Plaintiffs filed a complaint seeking declaratory and injunctive relief and asking the superior court to temporarily enjoin enforcement of the Act while the case proceeded. As relevant here, Plaintiffs alleged that the Act is facially unconstitutional because it violates two rights guaranteed by the Arizona Constitution: the right to speak freely, *see* Arizona Constitution article 2, section 6 (the "Speak Freely Clause"), and the right to privacy in one's private affairs, *see* Arizona Constitution article 2, section 8 (the "Private Affairs Clause"). The original defendants were the Commission and the Secretary of State, but both the

Arizona Attorney General and Voters' Right to Know (the organization that sponsored the Act) intervened to defend the Act.

¶13        Defendants moved to dismiss the complaint pursuant to Arizona Rule of Civil Procedure 12(b)(6) for failure to state a legally valid claim, and the superior court granted the motion.   But the court allowed Plaintiffs to file an amended complaint to add a claim that the Act is unconstitutional as applied to them.   Defendants then moved to dismiss the amended complaint pursuant to Rule 12(b)(6), and the court granted the motion.   The court of appeals affirmed.   *Ctr. for Ariz. Pol'y Inc. v. Ariz. Sec'y of State*, 258 Ariz. 570, 590 ¶ 73 (App. 2024).

¶14        We granted review of Plaintiffs' subsequently filed petition for review because the case presents issues of statewide importance and interest that are capable of repetition.   We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

**DISCUSSION**

**A.   We Review The Superior Court's Judgment De Novo**

¶15        We review the superior court's dismissal of Plaintiffs' complaint and amended complaint de novo as deciding issues of law.   *See City of Mesa v. Ryan*, 258 Ariz. 297, 318 ¶ 8 (2024).   The court correctly dismissed the amended complaint under Rule 12(b)(6) if, as a matter of law, "[P]laintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof."   *Coleman v. City of Mesa*, 230 Ariz. 352, 356 ¶ 8 (2012) (quoting *Fid. Sec. Life Ins. Co. v. State Dep't of Ins.*, 191 Ariz. 222, 224 ¶ 4 (1998)).   To make this determination, we will assume the truth of Plaintiffs' factual allegations and indulge reasonable inferences from those facts.   *See id.* ¶ 9.   We give no weight to any conclusory statements.   *See id.*   Finally, we interpret the Arizona Constitution and the Act de novo as issues of law.   *See E.H. v. Slayton*, 259 Ariz. 472, 476 ¶ 8 (2025).

¶16        Before turning to the merits, we note the scope of our engagement with the dissent.   We address those points on which a failure to respond would leave readers uncertain whether our reasoning has accounted for them.   But we do not address every disagreement.   Some of the dissent's most forceful arguments concern not what the Arizona Constitution means but what the Act does.   The Act compels disclosures some donors would prefer to avoid; it reveals associations some would

prefer to keep private; it imposes obligations on those who finance campaign media. These are real effects, and reasonable people may disagree about whether the People should have adopted a law with these consequences. But the question before us is whether the Act is permissible under the Arizona Constitution, not whether the People made the right policy choice in enacting it. Our silence on any particular point should not be read as agreement with the respective policy choices enacted by the People. It reflects our judgment that the wisdom of the Act, or any part of it, is not ours to weigh.

### B. It Is Difficult To Prevail On A Facial Challenge

¶17 Facial constitutional challenges are rarely successful. *See State v. Wein*, 244 Ariz. 22, 31 ¶ 34 (2018) (describing success on such challenges as a "difficult feat"). They are disfavored for several reasons: they "often rest on speculation" and thus risk premature statutory interpretation on a "factually barebones record"; they "run contrary to the fundamental principle of judicial restraint" commending courts not to decide questions of constitutional law in advance of needing to decide them; and they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008) (citation modified).

¶18 We presume that laws enacted by initiative, as with those enacted by the Legislature, are constitutional. *Fann v. State*, 251 Ariz. 425, 433 ¶ 23 (2021). Ordinarily, a challenger must either "establish that no set of circumstances exists under which the [Act] would be valid, or show that the law lacks 'a plainly legitimate sweep.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (citation modified) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987); and then quoting *Wash. State Grange*, 552 U.S. at 449). As the U.S. Supreme Court has explained, "[t]he fact that the [Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Salerno*, 481 U.S. at 745.

¶19 When First Amendment interests are implicated, however, the U.S. Supreme Court has recognized another type of facial challenge: one under the overbreadth doctrine. *See Bonta*, 594 U.S. at 615; *AZ Petition Partners LLC v. Thompson*, 255 Ariz. 254, 258–59 ¶ 18 (2023). Under it, a court may "[invalidate a statute] as overbroad if a substantial number of its

applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bonta*, 594 U.S. at 615 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). This "expansive remedy" exists "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003); *see also AZ Petition Partners*, 255 Ariz. at 258 ¶ 18.

¶20 Our courts have not yet addressed the overbreadth doctrine in challenges brought solely under the Speak Freely Clause of the Arizona Constitution. We do so now. Both the First Amendment and the Speak Freely Clause safeguard speech from government restrictions, though they frame that protection differently. *See State v. Stummer*, 219 Ariz. 137, 142 ¶ 14 (2008). The First Amendment restrains government action ("Congress shall make no law . . . abridging the freedom of speech"), while the Speak Freely Clause affirmatively guarantees every person the right to speak freely about a topic, subject only to responsibility for abuse of that right ("Every person may freely speak . . . on all subjects, being responsible for the abuse of that right"). *See id.* Because the Clause and the First Amendment both protect free expression, we must likewise guard against laws that chill protected speech by invalidating statutes with a substantial number of unconstitutional applications relative to their legitimate scope. *See Ino Ino, Inc. v. City of Bellevue*, 937 P.2d 154, 163 (Wash. 1997) (stating that Washington's constitutional free-speech provision, on which Arizona's Speak Freely Clause was based, is "[no] less tolerant than the First Amendment of overbroad restrictions on expression when such restrictions rise to the level of a prior restraint"). Accordingly, we adopt the overbreadth doctrine for facial challenges brought under the Speak Freely Clause.

### C. Plaintiffs Have Not Alleged A Legally Valid Facial Challenge Under The Speak Freely Clause

#### 1. We Apply Arizona-Specific Scrutiny To Evaluate Claims Under The Speak Freely Clause

¶21 Under the First Amendment, courts apply exacting scrutiny to address a facial challenge to compelled disclosure laws. *See* U.S. Const. amend. I; *Bonta*, 594 U.S. at 607; *Doe v. Reed*, 561 U.S. 186, 196 (2010); *Buckley v. Valeo*, 424 U.S. 1, 64–65 (1976), *superseded by statute on other grounds as recognized in McConnell v. FEC*, 540 U.S. 93 (2003). To satisfy this standard,

the law's defender must show a "substantial relation" between the disclosure requirement and a "sufficiently important" governmental interest. *See Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010); *see also NAACP v. Alabama*, 357 U.S. 449, 463 (1958) (concluding that the state's interest must be "compelling"). Also, the regulation must be narrowly tailored to serve that interest. *See Bonta*, 594 U.S. at 608.

¶22 We asked the parties whether challenges under the Speak Freely Clause should be evaluated under a First Amendment standard of review or a different standard tailored to the Arizona Constitution. All contend that no new standard is needed and urge the Court to adopt one of the standards already developed under First Amendment jurisprudence, although they disagree about which tier of scrutiny applies.

¶23 Plaintiffs argue that the Speak Freely Clause's broader scope requires us to use strict scrutiny, the most stringent standard of review. And they ask us to apply that scrutiny only to laws targeting "abuses" of the free-speech right, asserting that *all* laws regulating non-abusive speech are per se unconstitutional. Defendants respond that standards of review are judicial constructs, not commands of constitutional text. They argue that exacting scrutiny is appropriate in compelled disclosure cases because it is consistent with federal precedent and accords with the Arizona Constitution's strong commitment to election transparency. *See, e.g.*, Ariz. Const. art. 7, §§ 12, 16; *id.* art. 14, § 18.

¶24 We acknowledge that the Speak Freely Clause and the First Amendment generally, but not invariably, offer the same protection for speech and the press. As the Washington Supreme Court has observed when interpreting the speech clause that Arizona adopted as our Speak Freely Clause, *see Stummer*, 219 Ariz. at 142 ¶ 14 n.4, a state constitutional provision may sometimes be more protective than its federal counterpart, but "it does not follow that greater protection is provided in all contexts." *See Ino Ino*, 937 P.2d at 162, 166; *see also Kotterman v. Killian*, 193 Ariz. 273, 305–06 (1999) (Feldman, J., dissenting) (finding that "Washington cases interpreting their constitution are persuasive authority with respect to our [C]onstitution"). Consistent with that understanding, the Washington Supreme Court has held that Washington's free-speech clause does not offer broader protection than the First Amendment for obscenity, commercial speech, speech in nonpublic fora, defamatory statements, and nude or sexually explicit dancing. *See Ino Ino*, 937 P.2d at 162–63.

**¶25** In light of the similarities between the Speak Freely Clause and the First Amendment, we generally strive to apply the same principles under both unless our state provision justifies a departure. *See State v. Mixton*, 250 Ariz. 282, 290 ¶ 32 (2021) (recognizing "the value in uniformity with federal law when interpreting and applying the Arizona Constitution"); *Stummer*, 219 Ariz. at 144 ¶ 23–24 (adopting the federal intermediate scrutiny standard to review a content-based law under the Speak Freely Clause but modifying it to accommodate the Clause's broader reach). Although it is not the case here, many parties challenging laws under the Speak Freely Clause may also raise First Amendment arguments. Applying the same principles under both challenges, when warranted, avoids confusion and enables parties and courts to draw on decades of First Amendment precedent. *See Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 282 ¶ 46 (2019) ("[W]e have often relied on federal case law in addressing free speech claims under the Arizona Constitution."). We therefore do so when appropriate.

**¶26** We are not persuaded to adopt wholesale the tiers of scrutiny applicable in First Amendment jurisprudence. Those tiers sort cases into rigid categories and then apply a one-size-fits-all test regardless of the actual burden on expression. *See, e.g.*, *Bonta*, 594 U.S. at 623 (Sotomayor, J., dissenting) ("The same scrutiny the Court applied when NAACP members in the Jim Crow South did not want to disclose their membership for fear of reprisals and violence now applies equally in the case of donors only too happy to publicize their names across the websites and walls of the organizations they support."). Using tiers also risks results-oriented decisions because the choice of which tier applies often dictates the result. *See Montgomery v. Carr*, 101 F.3d 1117, 1122 (6th Cir. 1996) (summarizing scholarly criticism that the tiers-of-scrutiny framework is "indeterminate" and "result-driven"). Nothing in the Speak Freely Clause or our caselaw warrants importing such an ill-fitting and overly rigid framework. Instead, we use the below-described, Arizona-specific standard of review, anchored on the meaning of our Speak Freely Clause.

### a.    Step One: Does The Challenge Concern Protected Expression?

**¶27** We first ask whether the Speak Freely Clause protects the expression at issue. *See Coleman*, 230 Ariz. at 357 ¶ 18 (determining initially whether tattooing is constitutionally protected expression under the First Amendment). We interpret the scope of the Clause's protection

by giving its words their ordinary meaning in context with other constitutional provisions adopted at statehood. *See State ex rel. Brnovich v. City of Phoenix*, 249 Ariz. 239, 244 ¶ 21 (2020); *see also State v. Osborne*, 14 Ariz. 185, 204 (1912) (stating that each provision in the Constitution should be construed as part of the whole and harmonized to prevent conflict); *State v. Baldwin*, 184 Ariz. 267, 273 (App. 1995) (stating that the Speak Freely Clause does not have primacy over other constitutional provisions); *State v. Gunwall*, 720 P.2d 808, 812 (Wash. 1986) (concluding that "other relevant provisions of the state constitution may require that the state constitution be interpreted differently" from the federal Constitution).

**¶28**        When Arizonans at the 1911 election adopted our constitution, including its declaration of individual rights, they intended the Speak Freely Clause to provide the primary protection for free-speech and free-press rights. *See Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 356 (1989) (explaining this is necessarily so because the people adopted the Constitution before the U.S. Supreme Court applied the federal Bill of Rights, including the First Amendment, to the states). Significantly, the Speak Freely Clause did not newly *grant* free-speech rights to Arizonans; it *guaranteed* the continued exercise of free-speech rights Arizonans already enjoyed before statehood. *See* Thomas M. Cooley, *Constitutional Limitations* 49 (6th ed. 1890) (explaining that state constitutions do not create rights but are the "consequence[] of personal and political freedom" and are designed to protect preexisting rights and powers); *see also id.* at 512–13 (explaining that state constitutional free-speech provisions "do not assume to create new rights, but their purpose is to protect the citizen in the enjoyment of those already possessed"). Ascertaining the rights Arizonans exercised at statehood, therefore, illuminates the scope of the Speak Freely Clause. *See id.* at 513. Our task when interpreting the Speak Freely Clause is to effectuate the public meaning Arizonans adopted in 1911, consulting federal doctrine when it aligns but not when it over or under protects expression compared to our provision. *See Mixton*, 250 Ariz. at 289 ¶ 28; *Brush & Nib Studio*, 247 Ariz. at 282 ¶ 46; *Stummer*, 219 Ariz. at 144 ¶ 23.

**¶29**        The text, history, and context of the Clause within the entire Constitution evidence that Arizonans in 1911 did not intend the Speak Freely Clause to protect all expressive acts. To that extent, our prior observations that a violation of the First Amendment necessarily violates the Speak Freely Clause were inaccurate. *See Brush & Nib Studio*, 247 Ariz. at 282 ¶ 47; *Coleman*, 230 Ariz. at 361 ¶ 36 n.5. For example, alongside the

Speak Freely Clause, the framers included a provision prohibiting corporations from making contributions "for the purpose of influencing any election or official action." *See* Ariz. Const. art. 14, § 18. To harmonize the two provisions, we must conclude that the framers and the voting public did not understand or intend corporate campaign contributions to be protected expression under the Speak Freely Clause. *See Osborne*, 14 Ariz. at 204. The Speak Freely Clause therefore does not prevent the prohibition of corporate campaign contributions. This is so despite the fact that the First Amendment prohibits such a restriction.[3] *See Citizens United*, 558 U.S. at 365 ("Government may not suppress political speech on the basis of the speaker's corporate identity.").

**¶30** We pause here to clarify our statements in *Coleman* and *Brush & Nib Studio* and to counter the dissent's assertion that the Arizona Constitution necessarily provides greater protection for individual free-speech rights in all circumstances than does the federal Constitution. *See infra* ¶ 237. More precisely stated, those cases should have explained that we independently interpret our own state constitutional provisions and are not constrained either to follow federal courts' interpretations of parallel provisions or to expand the protections afforded by the federal Constitution. Our interpretation of the Arizona Constitution is independent as a matter of federalism and therefore not bound by federal doctrine; our Constitution stands on its own terms and may be equally, more, or less protective than the U.S. Supreme Court's interpretation of analogous federal provisions. *See Sitz v. Dep't of State Police*, 506 N.W.2d 209, 217 (Mich. 1993) (observing that "[a]s a matter of simple logic," because state and federal constitutional texts "were written at different times by different people, the protections afforded may be greater, lesser, or the same"); *see also id.* n.12 (explaining that if a state court treats the federal Constitution as establishing a mandatory "floor," it allows "a federal governmental body—the United States Supreme Court—to define, at least in part, rights guaranteed by the state constitution" (quoting Earl M. Maltz, *False Prophet—Justice Brennan and the Theory of State Constitutional Law*, 15 Hastings Const. L.Q. 429, 443–44 (1988))); *Malyon v. Pierce County*, 935 P.2d 1272, 1281 n.30 (Wash. 1997) ("However useful that floor-ceiling metaphor may be, it obscures the larger truth that the level of protection of

---

[3] Article 14, section 18 likely violates the First Amendment. *See Citizens United*, 558 U.S. at 365. Regardless, it evidences the view in 1911 that such corporate contributions were not considered speech protected by the Speak Freely Clause.

rights under the state constitutions can be the same as, higher than, or lower than that provided by the federal constitution." (citation omitted)).

¶31 Of course, when the federal Constitution provides greater protection for individual rights, courts must apply the federal provision to resolve the case, assuming the parties have invoked it. *See* U.S. Const. art. VI, cl. 2; Hans A. Linde, *E Pluribus – Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165, 179 (1984) (acknowledging that state constitutional provisions may be less protective than their federal counterparts and explaining that if that is the case, "the court must go on to decide the claim under federal law, assuming it has been raised"). Put differently, the federal Constitution sets a floor for federal rights, not a rule of construction for state constitutional text. Plaintiffs do not allege any federal constitutional claims.

¶32 With these principles clarified, we return to step one of the framework governing a claim brought under the Speak Freely Clause. If the Speak Freely Clause does not protect the expression at issue, our inquiry ends. If it does, we proceed to step two.

### b. Step Two: Does The Challenged Act Prevent People From "Freely" Speaking, Writing, and Publishing?

¶33 If expression protected by the Speak Freely Clause is at issue, we next consider whether the challenged law prevents people from "freely" engaging in that expression. Upon inspection, use of this seemingly simple term within the Clause is nuanced and does not, as Plaintiffs and the dissent argue, guarantee Arizonans the right to engage in non-abusive speech completely free from governmental regulation. *See infra* ¶ 166. We seek to give "freely" its original meaning, as understood by the public that adopted the Arizona Constitution and as read in the context of the whole Constitution. *See Torres v. JAI Dining Servs. (Phx.), Inc.*, 256 Ariz. 212, 223 ¶ 41 (2023) (Bolick, J., concurring). Thus, unlike the dissent, we do not restrict our review to dictionary definitions but undertake the more fulsome review required to determine original public meaning. *See infra* ¶¶ 158–62.

**(1) What does "freely" mean in the Speak Freely Clause?**

¶34      When Arizonans adopted the Constitution in 1911, acting "freely" meant doing so "without restraint or compulsion." *See Freely*, Webster's Int'l Dictionary of the Eng. Language (1907). Thus, provisions like the Speak Freely Clause were understood as forbidding prior restraints on expression—such as gag orders, publication licenses, or advance censorship—and prohibiting punishment for expressions that were not considered an abuse of the right. *See Phx. Newspapers, Inc. v. Superior Court*, 101 Ariz. 257, 260 (1966) ("The language of this provision makes plain its purpose to prevent previous restraints upon publication." (quoting *Ex Parte McCormick*, 88 S.W.2d 104, 106 (Tex. Crim. App. 1935))); Cooley, *supra* ¶ 28, 510–18 (reviewing free-speech and free-press history leading to adoption of state constitutional provisions identical to or like the Arizona provision); *id.* at 517 (explaining it would be a "mockery" of liberty to allow people to speak, write, and publish what they wanted but then punish them for doing so). And, although apparently not addressed by courts or respected commentators of the day, because compelled speech is incompatible with speaking "freely," we conclude that the Clause necessarily protects against compelled expression as well.

¶35      Cases decided under the Speak Freely Clause reflect this original understanding. In *Brush & Nib Studio*, we held that a city ordinance prohibiting discrimination on the basis of sexual orientation compelled designers to create custom wedding invitations in violation of their right under the Speak Freely Clause to not speak in support of same-sex marriages. 247 Ariz. at 305 ¶ 166. In *Phoenix Newspapers*, we held that an order barring a newspaper from reporting on open court proceedings violated the Clause because it imposed an advance restraint. 101 Ariz. at 259–60. Other cases have similarly invalidated prior restraints. *See Mountain States*, 160 Ariz. at 357 (striking an order requiring a telephone company to block messages absent a pre-subscription); *Phx. Newspapers Inc. v. Jennings*, 107 Ariz. 557, 559–60 (1971) (vacating an order excluding the public and reporters from attending trial); *Truax v. Bisbee Local, No. 380, Cooks' & Waiters' Union*, 19 Ariz. 379, 393–94 (1918) (upholding dismissal of a complaint seeking to enjoin peaceful picketing). These prior-restraint cases align with the prevailing territorial-era view that federal and state free-speech clauses primarily emanate from a desire to prevent governmental censorship, which "was inconsistent with free institutions." *See State v. Tugwell*, 52 P. 1056, 1060 (Wash. 1898); *see also* Ariz. Const. art. 2, § 1 ("A frequent recurrence to fundamental principles is

essential to the security of individual rights and the perpetuity of free government.").

### i. "Freely" Speaking Is Harmonious With The Exercise Of General Regulatory Authority

¶36　　　　Nonetheless, Arizonans in 1911 understood that although "freely speaking, writing, and publishing" provided robust protection against censorship, it did not render expression "free" from the government's legitimate exercise of its general regulatory powers, including its police power. *See* Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* § 15 (1904) (noting that "speech and press are primarily free," yet remain subject to restraints and burdens adopted "in the interest of good order or morality"); *Roebuck v. Mayo Clinic*, 260 Ariz. 384, 395 ¶ 29 (2025) (recognizing "inherent police powers" arising under Ariz. Const. art. 4, part. 1, § 1); *State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 600 ¶ 47 (2017) (describing the state's "broad police power" as protecting "life, liberty, and property" and preserving "the public peace and order" (quoting *Luhrs v. City of Phoenix*, 52 Ariz. 438, 444 (1938))). Arizonans both before and after statehood understood that the police power permitted reasonable regulation of expression when necessary to secure and promote public health, safety, morals, and general welfare. *See Allen v. State*, 14 Ariz. 458, 480 (1913) (recognizing the state's police power); *Aiton v. Bd. of Med. Exam'rs of Ariz.*, 13 Ariz. 354, 357 (Ariz. Terr. 1911) (recognizing the territory's police power); *see also State v. Harold*, 74 Ariz. 210, 216 (1952) ("[S]o long as the [L]egislature enacts laws reasonably necessary for the preservation of the public health, safety, morals or general welfare of the public it is acting within the police power of the state."); *Am. Fed'n of Lab. v. Am. Sash & Door Co.*, 67 Ariz. 20, 26–27 (1948) (stating that police power is "one of the powers impliedly reserved to the states by the Tenth Amendment").[4]

¶37　　　　Territorial practice confirms this understanding. The 1864 Howell Code, for example, included a criminal libel provision punishing "malicious defamation" of those living or dead, when expressed in print, signs, or pictures, while preserving a truth defense. *See* Howell Code, ch. X, § 122 (1864). Just over a decade before statehood, the 1901 Revised

---

[4]　The states' plenary police power further distinguishes state constitutions from federal constitutions and counsels caution before importing federal constitutional doctrine.

Statutes contained several criminal laws impacting expressive acts, including prohibiting obscene or indecent writings and drawings; singing lewd or obscene songs in a public place; and creating and distributing advertising materials that promoted contraception or abortion. *See* Rev. Stat. Ariz. Territory, Penal Code, tit. IX, ch. 83, §§ 283(3), (5); 288 (1901).

¶38 Territorial municipalities also enacted ordinances impacting free expression. Immediately before statehood, for example, the City of Tucson required various trades and occupations to procure licenses. *See Charter & Ordinances of the City of Tucson*, Ord. 283, § 1 (1910). It also excluded "offensive or unwholesome" businesses, including dance halls, from incorporated areas. *See id.* Ord. 200, § 1.

¶39 The first post-statehood Legislature confirmed the territorial understanding by enacting laws impacting expression. For instance, it prohibited misleading or false labeling of food and beverages. *See* 1912 Ariz. Sess. Laws ch. 62 (1st Spec. Sess.). It also authorized cities to adopt reasonable time, place, and manner restrictions on expression—for example, prohibiting "disorderly noise or disturbance," regulating "crying of goods," regulating performances that drew crowds, and licensing public exhibitions. *See* 1913 Ariz. Rev. Stat. Civ. Code tit. VII, ch. 2 § 1831; *see also* Freund, *supra* ¶ 36, § 480 (recognizing that public assemblies may be reasonably regulated as to "time and place, and number and duration of meetings"); *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) (characterizing sign regulations as an exercise of a municipality's police powers).

¶40 Municipal ordinances adopted around statehood further demonstrate this settled expectation. The City of Tucson, for instance, restricted posting advertisements and other writings on lamp posts. *See Charter & Ordinances of the City of Tucson*, Ord. 44, § 9 (1910). The City of Phoenix likewise authorized regulations concerning banners, advertisements, and handbills, the construction of billboards, and the operation of theaters and exhibitions. *See Charter of the City of Phoenix* ch. 4, § 2(15), (17), (31) (1913). It also authorized its council to "license, regulate, restrain or prohibit all theaters, exhibitions, public shows [and] dance halls." *Id.* ch. 4, § 2(31).

¶41 Finally, Arizonans in the statehood era understood and accepted that the police power enabled the government to compel factual, nonideological disclosures necessary to protect public health, safety, and welfare. *See Aiton*, 13 Ariz. at 357; *Allen*, 14 Ariz. at 480 (holding that the

relevant act was a valid exercise of the state's police powers). The 1901 Revised Statutes compelled political party committees within thirty days of an election to file statements "setting forth in detail all sums of money received, from whom received, and to whom and for what purpose such money was paid by such committees, during the preceding election." *See* Rev. Stat. Ariz. Territory, Penal Code, tit. IV, § 66 (1901). Tucson's ordinances also illustrate the exercise of police-power measures in the compelled-expression context: saloons had to post "No minor allowed here" signs; businesses were prohibited from selling obscene language and lewd books; homeowners had to report contagious diseases suffered by residents and maintain a publicly posted warning outside their homes; officiants had to report marriages; physicians had to report births and deaths; milk wagons had to display the proprietor's name and license; gambling businesses were barred within one mile of the city; and poisons had to be labeled as such. *See Charter & Ordinances of the City of Tucson*, Ord. 36, §§ 7, 13–14; Ord. 44, §§ 1, 6, 10, 18; Ord. 51, §§ 2–4; Ord. 200, § 1; Ord. 306, § 6 (1910). These enactments, existing before and at statehood, evidence Arizonans' understanding that the exercise of the State's police powers for health, safety, and welfare—as illustrated—did not conflict with Arizonans' right to speak "freely."

**¶42** The dissent reaches a different conclusion. It accepts that the state retains its police power but views the Clause's textual limitation—that speakers are "responsible for the abuse of that right" — as defining what the police power may reach. *See infra* ¶¶ 161–64. Under the dissent's interpretation, lawmakers may regulate expression only when the expression constitutes an abuse, which the dissent defines to include "violating laws that maintain public order and safety." *See id.* This interpretation suffers from two related problems.

**¶43** First, it asks the Clause to do something the text does not say or require. "[R]esponsible for the abuse of that right" is grammatically directed at the speakers, not at lawmakers. It tells speakers who exercise the right that they remain answerable for harms their speech causes to the community or individuals. It does not tell lawmakers what categories of expression they may regulate. To convert the provision into a substantive cap on legislative reach, one would have to rewrite it to say something like, "lawmakers may regulate only abuses of that right." The Clause says no such thing. And the historical record confirms that Arizonans in 1911 did not understand it to say so. Arizonans lived under and accepted a substantial body of police-power regulation affecting expression—electoral

disclosures, restrictions on posting advertisements, reporting laws, licensing, and the like—all of which would be unconstitutional under the dissent's reading, yet which Arizonans regarded as fully consistent with the right to speak freely.   *See supra* ¶¶ 36–41.

**¶44**        Second, the dissent's reading falls victim to the very critique our colleagues level at us.   By defining "abuse" to include "violating laws that maintain public order and safety," the dissent makes its substantive limit on legislative reach coextensive with whatever lawmakers have chosen to enact for those purposes.   The category of "abuse," which is purportedly the textual constraint on police-power regulations, is bounded only by the police power's own exercise.   Yet the dissent elsewhere attacks our framework as "nebulous and sweeping [and] invit[ing] government suppression of speech."   *See infra* ¶ 129.   That charge has no force against us, because our framework subjects every police power regulation to the inquiries set forth below.   *See infra* ¶¶ 52–56.   But it has real force against the dissent's own interpretation.   Once "abuse" is defined to include violations of laws maintaining public order and safety, the dissent's textual limit becomes whatever lawmakers have enacted for those purposes—the very lack of a limiting principle the dissent attributes to our framework.

**¶45**        The Clause actually says something simpler.   The right to speak "freely" describes the conditions under which expression occurs, and Arizonans in 1911 understood those conditions to include the legitimate exercise of the state's police power, subject to judicial review.   *See supra* ¶¶ 36–41.   "[R]esponsible for the abuse of that right" describes what follows after expression has occurred: the speaker who exercises the right and causes harm bears responsibility for the consequences—civil, criminal, or otherwise—the law has provided.   These two concepts do not compete in the same regulatory space.   They serve different functions and operate at different times.   The dissent's reading conflates them, and the conflation cannot be reconciled with either the Clause's text or its history.   Our reading, by contrast, gives each provision the function its text supports: it preserves the robust protection of speaking "freely" while preserving the accountability the text expressly contemplates.   That, we conclude, is what Arizonans in 1911 understood the Clause to mean.

### ii. "Freely" Speaking Is Harmonious With The State's Exercise Of Constitutional Directives

**¶46** Arizonans at statehood also understood that the Arizona Constitution itself required the Legislature to enact certain laws, even when doing so might incidentally restrain or compel expression. Most notably, the Constitution directs the Legislature to enact laws "providing for a general publicity" of contributions to campaign committees and candidates, and "to secure the purity of elections and guard against abuses of the elective franchise." *See* Ariz. Const. art. 7, §§ 12, 16. It further authorizes the state to compel production of certain corporate records to effectuate "the full visitorial and inquisitorial powers of the state," *see* Ariz. Const. art. 14, § 16, and to compel testimony regarding "the guilt of any . . . person or corporation charged with bribery or illegal rebating," *see id.* art. 2, § 19. And it obligates the Legislature to establish and maintain a "general and uniform public school system" and "provide for the education and care of pupils who are hearing and vision impaired," which necessarily encompasses authority over curriculum and classroom expression. *See id.* art. 11, § 1. These examples illustrate that the Constitution itself compels disclosure to various ends. Any constitutionally directed legislation, like police-power regulation, remains subject to judicial review under the framework set forth below. *See infra* ¶¶ 52–56.

### iii. "Freely" Speaking Does Not Tolerate Other Interferences

**¶47** The Speak Freely Clause tolerates no censorship or restraint—major or minor—on the right to speak, write, or publish on any subject except through the state's proper exercise of its regulatory authority and in accordance with the Constitution's directives. *See Mountain States*, 160 Ariz. at 357. That is what it means to speak, write, and publish "freely." Although courts may sometimes accommodate competing constitutional interests, such as the right to a fair trial, they may not dilute speech protections merely for reasons of administrative ease, policy preference, or other regulatory convenience. *See id.* Instead, we apply the Clause as written, in context, and as understood at statehood. *See id.* Simply put, for speech that falls within the Clause's protective scope and is not subject to a valid exercise of the state's regulatory authority or a constitutional directive, there is no such thing as "good enough" protection.

### (2) How Should Courts Evaluate Challenges To Speaking "Freely"?

**¶48**         So where does this leave us?   Sometimes, the inquiry and outcome will be straightforward.   Unless the expression at issue conflicts with another constitutional right, laws that censor, hinder, or compel speech, when not grounded in the state's proper exercise of its regulatory power or a constitutional directive, must be stricken as violating the Speak Freely Clause.   *See supra* ¶¶ 34–46.   When laws enacted pursuant to the state's regulatory authority or a constitutional directive interfere with or compel speech, we evaluate challenges under different standards, depending on whether the law is a time, place, and manner restriction or otherwise impacts expression.

### i.   Evaluating Time, Place, and Manner Restrictions

**¶49**         In *Mountain States* and *Stummer*, we set out Arizona-specific standards for evaluating laws that regulate when, where, and how expression can be made.   Contrary to the dissent's assertion, these standards are neither "new" nor "unprecedented."   *See infra* ¶ 129. Those cases establish that we evaluate challenges differently depending on whether the law is content-neutral or content-based.   Because the Speak Freely Clause vigorously protects the right to speak, write, and publish on any subject, we more closely scrutinize laws that single out expression based on its disfavored content.   *See Stummer*, 219 Ariz. at 144 ¶ 23.   A law that survives scrutiny as a valid time, place, and manner regulation does not interfere with Arizonans' right to "freely" speak, write, and publish under the Speak Freely Clause and must be upheld.

**¶50**         For content-neutral laws that regulate the time, place, or manner of speech, we have adopted for our own the test used in First Amendment jurisprudence.   *See Mountain States*, 160 Ariz. at 357–58. Thus, to determine whether a time, place, and manner regulation is reasonable and thus permissible under the Speak Freely Clause, the State must show that the regulation: (1) is content-neutral; (2) serves a significant governmental interest; and (3) is drawn with narrow specificity to minimize interference with the ability of speakers to communicate with others.   *See id.*

**¶51**         For content-based time, place, and manner regulations, a more searching two-step inquiry applies.   *See Stummer*, 219 Ariz. at 144

¶ 24.   First, once the challenger shows interference with expression, the state must demonstrate that the regulation targets secondary effects of the speech rather than suppressing protected expression.   *See id.* ¶ 25. Courts defer to the enacting body's explanation at this step.   *See id.* at 145 ¶ 27.   Second, if the state satisfies that showing, courts then assess whether the regulation (1) protects a substantial governmental interest; (2) significantly furthers that interest; and (3) does not unduly burden protected expression.   *Id.* at 144–45 ¶ 27.   No deference is given at this stage.   *See id.*

### ii.   Evaluating Compelled Electoral Disclosure Laws

**¶52**        When a law enacted under the state's regulatory power or a constitutional directive affects expression but is not a time, place, and manner restriction—such as requirements for factual disclosures, professional warnings, licensing, zoning, or administrative reporting—we review any burden on speech under a distinct approach.   Because our caselaw in this area is limited, and we are mindful that broader pronouncements could affect situations not before us, we confine today's discussion to the standard for reviewing compelled electoral disclosure laws like the Act, which requires covered persons to disclose the identity of major donors whose funds are used for campaign media.

**¶53**        The Act is consistent with the Arizona Constitution's directive to enact registration and other laws "to secure the purity of elections and guard against abuses of the elective franchise."   *See* Ariz. Const. art. 7, § 12; *see also* Prop. 211, § 2(B) (describing the Act's purpose and intent in part as "to prevent corruption and to assist Arizona voters in making informed election decisions by securing their right to know the source of monies used to influence Arizona elections").   It may also serve the public welfare.   *See Am. Fed'n of Lab.*, 67 Ariz. at 27.

**¶54**        Given the Constitution's twin commitments to robust free expression and election integrity and transparency, an Arizona-specific standard is warranted, one that invalidates laws that either fail to advance election integrity or transparency or that impose unreasonable burdens or hindrances on speech.   Thus, once a challenger shows that protected expression is at stake, the state (or a private party defending the law) must show that the disclosure requirement (1) meaningfully furthers election integrity or transparency; and (2) does not unreasonably burden or hinder protected expression.   *See Stummer*, 219 Ariz. at 144–45 ¶ 27 (emphasizing

an "undue burden" inquiry); *Harold*, 74 Ariz. at 216 (stating that laws "reasonably necessary" for public welfare are a valid exercise of the state's police power); *cf. Stanwitz v. Reagan*, 245 Ariz. 344, 348 ¶ 14 (2018) (permitting statutes to regulate constitutional provisions if they "'do[] not unreasonably hinder or restrict the constitutional provision and if the [statute] reasonably supplements the constitutional purpose' of the provision" (second alteration in original) (citation omitted)).

¶55 The "unreasonable burden or hindrance" part of this inquiry has both factual and justificatory components. As the party best positioned to know how the law affects its expressive activity, the challenger must first show that disclosure imposes a concrete, non-speculative burden—such as creating a credible risk of threats, harassment, or comparable harms that would chill future speech—or that the law compels them to convey views they do not endorse. *See Brush & Nib Studio*, 247 Ariz. at 305 ¶ 166; *Phx. Newspapers*, 101 Ariz. at 260; *see also Stummer*, 219 Ariz. at 144 ¶ 25 (imposing a similar requirement for content-based time, place, and manner laws); *Woerth v. City of Flagstaff*, 167 Ariz. 412, 419 (App. 1990) ("When proof of a negative assertion lies peculiarly within the knowledge of the adverse party, the burden of coming forward with evidence shifts to that party" (quoting in part *Sw. Cotton Co. v. Ryan*, 22 Ariz. 520, 533 (1921) (citation modified))). This threshold showing is important because, although the Speak Freely Clause protects expressive activity broadly, it does not specifically address financial contributions, associative anonymity, or records of political spending, and yet other constitutional provisions reflect strong commitments to electoral transparency. *See* Ariz. Const. art. 2, § 6; art. 7, §§ 12, 16; art. 14, § 18. This showing by the challenger does not relieve the state of its ultimate burden to justify the law's interference with expression; it simply identifies whether the challenger has plausibly alleged an undue-burden problem requiring justification.

¶56 Once the challenger makes this threshold showing, the state bears the burden of showing that the law does not unreasonably burden or hinder protected expression. *See Stummer*, 219 Ariz. at 145 ¶ 27. The reasonableness of any burden or hindrance will depend on the importance of the state interest at stake, whether the law furthers that interest, and the degree to which the law burdens or hinders expression. *See id.* ¶¶ 28–30. If the state satisfies this standard, the law does not unconstitutionally interfere with Arizonans' ability to "freely" speak, write, or publish. But if the state does not succeed, the law may only survive the challenge if it

addresses "abuses" of speech, like defamation, fraud, or other harmful acts. *See* Ariz. Const. art. 2, § 6; *see also Yetman v. English*, 168 Ariz. 71, 82 (1991) (recognizing defamation as unprotected speech); *Truax*, 19 Ariz. at 394 (characterizing "abuse" as "harm of another" or harm to the public). Absent such an abuse, the Clause does not tolerate laws and regulations that unreasonably interfere with protected expression. *See Mountain States*, 160 Ariz. at 357. Because this framework bears some resemblance to First Amendment exacting scrutiny analysis, we may consult that related jurisprudence where helpful. *See Mixton*, 250 Ariz. at 290 ¶ 32; *Stummer*, 219 Ariz. at 144 ¶ 22. First Amendment jurisprudence is helpful, though, only to the extent it illuminates the practical consequences of disclosure, both beneficial and burdensome, not because it supplies the governing standard. The Speak Freely Clause remains an independent source of constitutional protection.

¶57 The dissent characterizes our framework as appearing "less protective" than exacting scrutiny. *See infra* ¶ 236. The criticism misses the mark because the comparison itself is misconceived. Just as the First Amendment does not set the floor for protections afforded by the Speak Freely Clause, *see supra* ¶ 30, exacting scrutiny does not set the floor for our analysis under it.

¶58 In any event, our framework is not less protective. Exacting scrutiny asks whether a disclosure requirement bears a "substantial relation" to a "sufficiently important" governmental interest and, if so, whether the regulation is narrowly tailored to serve that interest. *See Bonta*, 594 U.S. at 608; *Citizens United*, 558 U.S. at 366–67. Our standard correspondingly requires the law's defender to show both that the disclosure requirement meaningfully furthers election integrity or transparency *and*, independently, that the law does not unreasonably burden or hinder protected expression. *See supra* ¶¶ 53–56. The two inquiries may weigh similar considerations, but our framework structures them differently. Once a challenger plausibly alleges a concrete burden—threats, harassment, reprisals, compelled association, or comparable chilling effects—the state must justify the regulation in light of the importance of the asserted interest, the degree to which the law advances it, and the burden imposed. *See supra* ¶¶ 53–56. That structure is not a diminution of the federal standard; if anything, it makes the analytical sequence stronger and more transparent and assures that the burden on free expression receives the explicit attention the Speak Freely

Clause demands. Federal cases may inform that analysis, but they do not direct it.

**¶59** In sum, challenges under the Speak Freely Clause are evaluated through an Arizona-specific framework rooted in the Clause's text, context, and public meaning at statehood. Courts first determine whether the expression at issue is protected and then evaluate whether the challenged law prevents people from "freely" engaging in that expression. The Clause generally forbids prior restraints and compelled speech laws, but it accommodates reasonable regulations enacted pursuant to the state's regulatory authority or constitutional directives. Time, place, and manner restrictions are reviewed under the standards set forth in *Mountain States* and *Stummer*, depending on whether they are content-neutral or content-based. Compelled electoral disclosure laws, like the Act, are examined under an Arizona-specific standard. This approach preserves the Speak Freely Clause's full protective force while recognizing the Constitution's equally deliberate commitment to transparent and fair elections.

> **2.** **Plaintiffs' Facial Claim Does Not Survive Arizona-Specific Scrutiny**

> **a.** **Step One: The Challenge Concerns Protected Expression**

**¶60** We first consider whether Plaintiffs have sufficiently alleged that the Speak Freely Clause protects the expression at issue. *See Coleman*, 230 Ariz. at 357 ¶ 18. Plaintiffs allege that the Act violates the Clause by requiring covered persons to disclose major donors who fund campaign media spending, which in turn discourages the Doe plaintiffs and others from making donations for that purpose and deters CAP, FEC, and similar organizations from engaging in such spending to protect their donors' identities. Thus, the expression at issue is donors' contributions to organizations for the purpose of funding campaign media and those organizations' spending for campaign media.

**¶61** At most, these contributions are expressive conduct, which the Speak Freely Clause does not specifically address. *See* Ariz. Const. art. 2, § 6; *see also Ino Ino*, 937 P.2d at 163 (noting the absence of language relating to expressive conduct in Washington's free-speech clause). Still, at statehood "to speak" could involve more than verbalizing. More

expansively, it also meant "to convey sentiments, ideas, or intelligence as if by utterance" and "to express in any way." *See Speak*, Webster's Int'l Dictionary of the Eng. Language (1907); *see also* William Shakespeare, *Richard II* act 5, sc. 3, l. 129 ("Thine eye begins to speak."). We know Arizonans at statehood spoke sentiments and ideas through gestures and other conduct—for example, wearing yellow ribbons or carrying yellow flowers to express support for women's suffrage—and did so free from government censorship. *See* Katherine Kitterman, *Suffrage Colors Explained*, Utah Women's History (July 10, 2020) (available at utahwomenshistory.org/2020/07/suffrage-colors-explained).
Accordingly, because the Speak Freely Clause guarantees the continued exercise of free-speech rights enjoyed at statehood, it guarantees the right to freely engage in expressive conduct. *See Bird v. State*, 184 Ariz. 198, 204 (App. 1995); *see also id.* at 202 n.2 (applying the Speak Freely Clause to expression albeit using First Amendment jurisprudence); Cooley, *supra* ¶ 28, at 512–13.

**¶62** However, not every act intended to be expressive is protected by the Speak Freely Clause. *See Bird*, 184 Ariz. at 204. To determine whether conduct is expressive, we ask whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Id.* (alterations in original) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). Because donating to an organization for the express purpose of funding campaign media or knowingly permitting one's donation to be used for that purpose is objectively understood as conveying agreement with the resulting message, we conclude that such contributions constitute expressive conduct protected by the Speak Freely Clause. *See McCutcheon v. FEC*, 572 U.S. 185, 204 (2014) (characterizing campaign contributions as an exercise of expressive rights under the First Amendment); *Doe*, 561 U.S. at 195 (stating that a signature on a referendum petition expresses a viewpoint). Similarly, spending for campaign media objectively reflects an organization's agreement with the message and is therefore expressive conduct. *See McCutcheon*, 572 U.S. at 204. Plaintiffs have therefore adequately alleged that expression protected by the Speak Freely Clause is at issue.

> **b.** **Step Two: Plaintiffs Do Not Sufficiently Allege That The Act Prevents Donors And Covered Persons From "Freely" Speaking In A Substantial Number Of Applications Relative To The Act's Legitimate Sweep**

> **i.** **The Disclosure Requirements Meaningfully Further Election Integrity and Transparency**

**¶63** Using disclosure requirements to advance integrity and transparency in election spending is deeply rooted in Arizona's history. On the eve of statehood, territorial law already required candidates and political committees to file detailed public reports disclosing the sources and expenditures of campaign funds, both direct and indirect through intermediaries. Rev. Stat. Ariz. Territory, Penal Code. pt. 1, tit. IV, § 66 (1901). At the same time, an early and identical version of the Speak Freely Clause, contained within the territorial bill of rights, guaranteed the right to speak "freely" but held speakers accountable for abuses of that right. Rev. Stat. Ariz. Territory, tit. I, ch. 1, § 16 (1901). Taken together, these provisions reflect the territorial understanding that free-speech protections did not shield campaign-related contributions, even those made through intermediaries, or contributor identities from reasonable publicity requirements.

**¶64** The constitutional framers did not depart from that understanding. Nothing in the constitutional convention debates suggests that mandatory disclosure of campaign contributions was thought to violate the Speak Freely Clause. On the contrary, the framers embedded election transparency into the Constitution itself as a defining feature of Arizona's new government.

**¶65** Alongside the Speak Freely Clause, the framers included the "General Publicity Clause," requiring the first Legislature to pass a law mandating disclosure before and after elections "of all campaign contributions to, and expenditures of campaign committees and candidates for public office."[5] Ariz. Const. art. 7, § 16. Article 7, section 12 likewise

---

[5] Plaintiffs misapply the *exclusio alterius* principle of statutory construction in arguing that the General Publicity Clause bars publication of election-related contributions that are not made directly to campaign committees or candidates. The *exclusio alterius* principle means that if a

directs the Legislature to enact "registration and other laws to secure the purity of elections and guard against abuses of the elective franchise." And as previously described, article 14, section 18 prohibits corporations from making contributions "for the purpose of influencing any election or official action." These provisions demonstrate a constitutional intent to direct the exercise of the police power to ensure transparent and corruption-resistant elections and reasonably encompass legislation requiring disclosure of contributors to groups that expend significant resources to independently support or oppose candidates or ballot measures.

¶66 Plaintiffs argue that because the framers did not adopt an earlier, more expansive version of what became the General Publicity Clause, they implicitly prohibited disclosure provisions like those in the Act. The dissent likewise argues that failure of the earlier proposal "expressly rejected" legislative authority to enact such disclosure provisions. *See infra* ¶ 208. We disagree. Plaintiffs' and the dissent's position conflicts with the well-established principle that the Arizona Constitution "does not grant power, but instead limits the exercise and scope of legislative authority." *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 5 ¶ 13 (2013). Because the General Publicity Clause does not prohibit broader disclosure laws, the People were free to enact the Act. *See id.* ("[W]e do not look to the constitution to determine whether the [L]egislature is authorized to act." (quoting *Citizens Clean Elections Comm'n v. Myers*, 196 Ariz. 516, 520 ¶ 12 (2000) (citation modified))).

¶67 The constitutional records further support this understanding. They do not precisely reflect why the framers chose the General Publicity Clause's final language, but debates indicate a consensus

_____

law specifically lists certain things within a category, it implies the drafters intended to exclude non-listed things from the same category. *See Sw. Iron & Steel Indus. v. State*, 123 Ariz. 78, 79 (1979). But even if this principle applies here, it does not support Plaintiffs' argument. It would simply mean that indirect, election-related contributions are excluded from the *mandatory* publication required by the General Publicity Clause. *See id.* But that would not prohibit the Legislature or the People from enacting further disclosure requirements. *See Matthews v. Indus. Comm'n of Ariz.*, 254 Ariz. 157, 161 ¶ 19 (2022) (noting the Legislature is free to enlarge the scope of workers' compensation beyond that mandated by the Constitution). And the Legislature has done so. *See supra* ¶ 3 n.1.

that the Constitution should establish fundamental principles while leaving implementation details to legislative enactment. *The Records of the Arizona Constitutional Convention of 1910*, 145–50 (John S. Goff ed., 1991). As delegate Jones explained when discussing disclosure deadlines, the framers did not "go into every detail" because they believed it was not their role to draft "every law that is legislative in nature," and that such matters should be left "to the people or to the [L]egislature." *Id.* at 149–50. Nothing in the debates suggests an intent to prohibit additional electoral disclosure laws. On the contrary, it appears the framers desired as much transparency as reasonably achievable through future legislation. *See* Ariz. Const. art. 7, § 12.

¶68 The emphasis on election transparency is entirely consistent with the framers' broader progressive approach. *See* John D. Leshy, *The Making of the Arizona Constitution*, 20 Ariz. St. L.J. 1, 30–31 (1988) (describing the national progressive movement's influence on the framers). The Arizona Constitution as a whole embodies the progressive conviction that Arizonans—the People—should exercise direct control over government through elections free from distortion. *See* Ariz. Const. art. 2, § 21 (guaranteeing that all elections are "free and equal" and that "no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage"); *id.* art. 4, pt. 1, § 1 (establishing initiatives and referenda); *id.* art. 7, § 1 (requiring a secret ballot); *id.* art. 7, § 10 (mandating direct primary elections); *id.* art. 8, pt. 1, §§ 1–6 (providing for the recall of public officials). These provisions reflect the progressives' determination to ensure that political institutions remained accountable to the People rather than captured by powerful economic interests. *See* Leshy, *supra* ¶ 68, at 89–90 (quoting delegate Cunniff's observation that "in almost every state . . . corporations have altogether too much influence in the [state's] direction and control" (alteration in original)); T. Roosevelt, *The New Nationalism*, 21, 30 (1910) (urging that "special interests should be driven out of politics" and advising that "all moneys received or expended for campaign purposes should be publicly accounted for" before and after an election).

¶69 Early post-ratification events confirm that the People viewed compelled disclosure laws as important to the constitutional commitment to fair and transparent elections and yet consistent with the free-speech guarantee. Only months after statehood, the Legislature implemented article 7, section 16, the General Publicity Clause, and article 7, section 12, the purity-of-elections provision, requiring candidates and campaign

committees to disclose contributions, loans, promises of support, and the names and addresses of contributors. *See* 1912 Ariz. Sess. Laws ch. 69, §§ 6–7 (1st Spec. Sess.). Candidates also had to report "every promise or pledge made by him or by any one for him" to secure another's support. *Id.* § 7. Thus, Arizonans at statehood did not embrace the idea of anonymous campaign donations but instead recognized that anonymous donations in the election context were not protected by the Speak Freely Clause.

¶70 The dissent takes the opposite view by suggesting that Arizonans at statehood valued anonymous donations in elections. *See infra* ¶ 168. For support, it states that a national suffrage group collected anonymous donations and, in turn, contributed some of that money to support Arizona's women's suffrage ballot measure in 1912. *Infra* ¶ 168. The report cited by the dissent for this proposition shows that the National American Woman Suffrage Association indeed made a single donation to support Arizona's measure. *See Forty-Fourth Annual Report of the National American Woman Suffrage Association*, at 42 (1912). But although the Association itself apparently drew on anonymously donated funds, nothing in the report suggests Arizonans were aware of that fact. From their perspective, the donor was the National American Woman Suffrage Association, an identified, public organization. The dissent's evidence thus shows, at most, what the Association did—not what Arizonans understood or accepted. *See id.*

¶71 Five years later, dispelling any doubt about Arizonans' view of anonymous donations in ballot measure campaigns, the Legislature prohibited anonymous electioneering communications regarding initiatives and referenda, requiring persons who paid for such communications, even in part, to disclose their identities. *See* 1917 Ariz. Sess. Laws ch. 47, § 1 (Reg. Sess.). The substance of this law is now generally encompassed within the Act. The dissent states that the U.S. Supreme Court invalidated a California law restricting the distribution of anonymous handbills in *Talley v. State of California*, 362 U.S. 60 (1960), and suggests that comparable infirmities in the 1917 law prevented it from being enforced. *See infra* ¶ 230. It cites no evidence for this claim, and none is apparent. The California ordinance in *Talley* was not similar to the 1917 law; it broadly prohibited *all* anonymous leafletting. *See Talley*, 362 U.S. at 60–61. Neither the 1917 law nor the Act imposes a ban like the ordinance in *Talley*. They simply impose disclosure requirements, which

have been permitted as consistent with free speech guarantees.[6]  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 353–56 (1995) (distinguishing anonymous leafletting from compelled disclosures in the election context).

**¶72**         Statutes similar to Arizona's were widespread nationally, confirming that early legislatures viewed such disclosure requirements as important and compatible with state constitutional free-speech protections. *See id.* at 376–77 (Scalia, J., dissenting) (describing similar laws in the early part of the Twentieth Century as "widespread" and "long-established," thereby evidencing that such disclosures were not considered as "go[ing] to the heart of free speech").  We agree with the Washington Supreme Court that the People, "acting as legislators on ballot propositions," possess their own free-speech right to know who is attempting to influence their votes.  *State v. Grocery Mfrs. Ass'n*, 461 P.3d 334, 346 ¶ 45 (Wash. 2020) ("[T]he right to receive information is the fundamental counterpart of the right of free speech." (quoting *Fritz v. Gorton*, 517 P.2d 911, 924 (Wash. 1974) (plurality opinion))).

**¶73**         The dissent acknowledges the statehood-era disclosure requirements but, pointedly ignoring the 1917 law, asserts that none concerned the types of disclosures the Act requires.  *See infra* ¶ 168.  From this it concludes that the Speak Freely Clause "protects a person's right to donate anonymously to organizations that are not candidates or campaign committees."  *Infra* ¶ 168.  But that conclusion mistakes specific historical applications for the constitutional principle they reflect.  The statehood disclosure requirements embodied a single animating principle: that the public has a right to know who is financing efforts to influence their votes.  That principle did not fossilize with its statehood-era applications.  The framers established it and deliberately left implementation to future legislation, precisely because they recognized that circumstances would change.  *See supra* ¶ 67 (noting delegate Jones's explanation that the

---

[6]  The 1917 law was repealed, at the latest, when the Legislature adopted the Arizona Revised Statutes in 1956.  *See* A.R.S. § 1-102 (repealing "[a]ll laws and statutes of a general, public and permanent nature").  The dissent implies that the law was ill-fated and never enforced but cites no evidence for that claim.  *See infra* ¶ 230.  More fundamentally, the implication misses the point: by enacting the 1917 law, the statehood-era Legislature demonstrated that disclosure requirements of that kind were consistent with the Speak Freely Clause.

framers deliberately avoided specifying every detail, leaving such matters "to the people or to the [L]egislature"). Modern campaign media and its funding sources are a change in circumstances, not a change in principle.

¶74 Arizona's early enactments, adopted in the state's formative years, confirm that the framers and the People viewed disclosure of election-related contributions and contributor identities as essential, effective tools in preserving fair and transparent elections. *See Ino Ino*, 937 P.2d at 165 (stating that "statutes from the time of the constitution's ratification" are persuasive in deciding whether a provision gives more protection in an area). From the territorial era through the first legislative sessions after statehood, Arizona maintained an uninterrupted practice of election finance disclosure. That continuity reflects a consistent understanding that the integrity of elections depends in part on the public's ability to know who is financing efforts to influence their votes.

¶75 This understanding accords with First Amendment jurisprudence, which recognizes election transparency as a critical safeguard. Disclosure enables voters to evaluate messages, deters corruption and its appearance, and helps maintain public confidence in democratic processes.[7] *See Doe*, 561 U.S. at 198 (approving the assertion that "promoting transparency and accountability in the electoral process" is "essential to the proper functioning of a democracy"); *Citizens United*, 558 U.S. at 339, 370 ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it;" further, the prompt disclosure of expenditures enables people to "see whether elected officials are 'in the pocket' of so-called moneyed interests." (quoting *McConnell*,

_____

[7] Plaintiffs argue that an anti-corruption justification does not apply here because it is unique to contributions for media concerning candidates for office. Whether or not this is accurate, Plaintiffs overlook that the Act also applies to contributions for campaign media concerning candidates, and Plaintiffs seek to invalidate the entire Act, not just the provisions applicable to ballot measures. Also, FEC funds campaign media promoting or opposing candidates and claims that the Act unconstitutionally burdens that activity. And CAP publishes a voter's guide concerning candidates that arguably constitutes campaign media. Thus, the anti-corruption justification is relevant here. *See Citizens United*, 558 U.S. at 361 (acknowledging that "[i]f elected officials succumb to improper influences from independent expenditures," there is cause for concern).

540 U.S. at 259 (Scalia, J., dissenting))); *McConnell*, 540 U.S. at 197 (agreeing that "uninhibited, robust, and wide-open speech [cannot] occur when organizations hide themselves from the scrutiny of the voting public"); *Buckley*, 424 U.S. at 67 ("A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return."). As Justice Brandeis famously observed, "[p]ublicity is justly commended as a remedy for social and industrial diseases [and] [s]unlight is said to be the best of disinfectants." *Buckley*, 424 U.S. at 67 (quoting L. Brandeis, *Other People's Money* 62 (National Home Library Foundation ed. 1933)). Arizona's Constitution and history reflect the same conviction.

**¶76**     The dissent invokes *NAACP v. Alabama* and *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114 (2026), to illustrate that compelled disclosure of member or donor identities can violate the First Amendment. *See infra* ¶¶ 182–83. We do not disagree. But neither case prohibits election-related disclosures of the sort at issue here. *NAACP v. Alabama* held that a state attorney general's demand, in the midst of segregation-era litigation, for the production of NAACP's membership rolls deterred members from pursuing their interests with the organization without any showing of a state interest "sufficient to justify the deterrent effect" the disclosure would cause. 357 U.S. at 463–66. The Supreme Court has since drawn a consistent line between investigative demands of that kind, which compel a group to surrender its entire associational membership to a hostile state actor, and generally applicable electoral disclosure regimes tied to identifiable campaign expenditures, the latter of which the Court has repeatedly upheld under its application of exacting scrutiny. *See Buckley*, 424 U.S. at 64–84; *Citizens United*, 558 U.S. at 366–71.

**¶77**     *First Choice* does not disturb that line. It is a standing decision, holding only that an investigative subpoena demanding nonprofit donor information inflicts an injury sufficient to support a § 1983 suit. 146 S. Ct. at 1120, 1122. The Court explained why the alleged chill to associational rights clears the injury-in-fact bar required for standing; it did not announce a substantive rule invalidating electoral disclosure. *See id.* at 1127–29. *First Choice* itself concerned an investigative subpoena to a single nonprofit, *id.* at 1119, not a generally applicable electoral disclosure regime. The Act falls squarely in the second category.

¶78 For these reasons, Defendants have shown as a matter of law that by requiring public identification of major donors funding campaign media, the Act's disclosure requirements meaningfully further election integrity and transparency. Other courts have reached a similar conclusion when applying the First Amendment. *See, e.g.*, *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 998–99, 1019 (9th Cir. 2010) (finding a statute requiring disclosure of identifying information for political advertising substantially related to the government's informational interest); *Smith v. Helzer*, 95 F.4th 1207, 1211–12, 1219–21 (9th Cir. 2024) (same); *No On E v. Chiu*, 85 F.4th 493, 504–06 (9th Cir. 2023) (same).

¶79 Plaintiffs nevertheless argue the Act fails to meaningfully further election transparency or integrity because it purportedly "mandates" disclosure of "low-level intermediary donors" who contribute to entities such as churches or other § 501(c)(3) organizations and "may never know about, much less intend to support" campaign media spending by a downstream covered person. They illustrate their point with the example of a donor who gives more than $2,500 to a church, which later includes those funds in a bundled contribution to a covered person who uses the money for campaign media. The dissent advances the same basic point through two hypotheticals involving upstream donors of more than $5,000 and multiple intermediaries. *See infra* ¶¶ 149–52. In Plaintiffs' and the dissent's view, requiring disclosure of an original donor who neither intended nor even knew the funds would be used for campaign media does not meaningfully inform voters who is promoting the message.

¶80 But these hypotheticals do not describe what the Act requires. The better interpretation is that opt-out status remains a condition of disclosure; it is not a protection that becomes meaningless once funds pass through intermediaries. After a covered person exceeds the Spending Threshold, § 16-973(A)(6) requires disclosure to the Secretary of State of "*each donor* of original monies who contributed, directly or indirectly, more than $5,000 *of traceable monies* or in-kind contributions for campaign media spending during the election cycle to the covered person." (Emphasis added.) The Act defines "[t]raceable monies" as monies given to a covered person "for which *no donor has opted out* of their use or transfer for campaign media spending." § 16-971(18)(a) (emphasis added). By using the defined term "traceable monies" in the disclosure trigger, the Act makes disclosure depend on whether the contribution falls within the statute's opt-out-based definition of traceable monies, rather than merely on whether the funds can be traced from one entity to another.

¶81  We therefore do not read the Act to mean that once an individual donates to a church, charity, or other intermediary, that person's statutory protection against having the money used for campaign media spending without notice simply vanishes. The narrower and better reading is that when donated original monies pass through several hands, the statute continues to account for their source and transfer history but permits disclosure only if the donor contributed "traceable monies" — that is, monies for which the donor, whether immediate or upstream, was given notice and an opportunity to opt out of permitting the donation to be used or transferred for campaign media spending. This interpretation forecloses the compelled association hypotheticals Plaintiffs and the dissent posit and best aligns with the Act's stated purpose of preventing political contributions from being funneled through intermediaries to conceal the identities of persons knowingly underwriting campaign messaging delivered to the public. *See* Prop. 211 § 2(C); *see also Ariz. Downs v. Ariz. Horsemen's Found.*, 130 Ariz. 550, 554 (1981) (recognizing the Court's "duty, whenever possible, to give a construction to a statute which will render it constitutional").

¶82  To be sure, the Act does not answer every question about how its notice and tracing provisions operate in all circumstances. For example, it does not expressly specify who must provide upstream donors notice of the opt-out opportunity or require a covered person to investigate whether an immediate donor's contribution includes original monies from upstream donors. *See* § 16-972(D). Perhaps this is the type of detail left to the Commission in implementing the Act. *See* § 16-974(A). We need not resolve those implementation questions here. To the extent this uncertainty creates real-world disclosure problems for particular upstream donors who never received notice, that concern is properly addressed through as-applied challenges or Commission rulemaking under § 16-974(A) — not through facial invalidation of the entire Act. The dispositive point is that the Act's disclosure obligation is triggered only by "traceable monies," and the Act defines that term to include only monies "for which no donor has opted out of their use or transfer for campaign media spending." §§ 16-971(18)(a), -973(A)(6). The Act therefore cannot be properly interpreted as compelling disclosure of donors who were never given the opportunity to opt out of having their donations used for campaign media. Thus, the donors in the hypotheticals offered by Plaintiffs and the dissent would not be publicly identified. *See infra* ¶¶ 150–51.

**¶83** The dissent also suggests that only an opt-*in* regime could sufficiently protect donor's free-speech rights, relying on *Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298 (2012). *See infra* ¶ 188. But *Knox* arose in the distinct context of compelled union-fee assessments imposed on nonmembers, permitting an annual dues opt-out procedure for nonunion members but requiring an opt-in procedure for special assessments or midyear dues increases during the year. *See Knox*, 567 U.S. at 314, 322 & n.9. Even if *Knox* supplied a useful analogy, it would not support the dissent's conclusion. Indeed, at least one court since *Knox* has upheld a comparable opt-out feature against a First Amendment challenge in the election-disclosure context. *See Rio Grande Found. v. Oliver*, 154 F.4th 1213, 1228 (10th Cir. 2025) (upholding New Mexico's donor-disclosure provision and concluding that the statute's guardrails, including its opt-out mechanism, satisfied exacting scrutiny). Thus, while the dissent may have identified a better policy approach, that is not our charge in passing on the constitutionality of the Act.

**¶84** Plaintiffs' church hypothetical is flawed for an additional reason. The Act expressly provides that it "does not require public disclosure" of an original source that contributes $5,000 or less in an election cycle. § 16-973(A)(6), (G). The more-than-$2,500 trigger appears in the internal tracing and recordkeeping provisions: upon a covered person's written request, the direct donor must identify "each other person" who contributed more than $2,500 in original monies being transferred, and the covered person must maintain "transfer records" for Commission inspection on request. A.R.S. §§ 16-971(19), -972(A), (D). Thus, for this additional reason, the church hypothetical as framed, using amounts at or below the Act's operative "more than" thresholds, does not establish that the Act compels public disclosure of an upstream donor's identity.

**¶85** Finally, the dissent also points out that transfer records identifying persons who contributed more than $2,500 in original monies must be produced to the Commission on request and argues that such records could later become available under Arizona's public-records laws. *See infra* ¶ 142. But that possibility does not transform the Act's internal tracing provisions into a statutory command of public disclosure. The Act expressly distinguishes between the public reporting obligation, which applies only to contributions exceeding $5,000, and the lower-level recordkeeping provisions, which serve tracing and enforcement functions. *See* §§ 16-972(A), (D), -973(A)(6), (G). Whether records later obtained by the Commission at its request would be subject to disclosure under

37

Arizona's public-records law presents a separate and speculative question. Nevertheless, Plaintiffs do not allege that such a circumstance would arise in a substantial number of cases relative to the Act's legitimate sweep. A facial challenge therefore cannot be sustained by layering the Act's recordkeeping provisions onto a hypothetical future public-records dispute.

¶86    We therefore proceed with whether Plaintiffs have plausibly alleged that the Act unduly burdens or hinders protected expression in a substantial number of its applications.

### ii. The Act Does Not Unduly Burden Or Hinder Protected Expression In A Substantial Number Of Applications

¶87    In a facial challenge, and under our Arizona-specific framework, Plaintiffs must demonstrate that the Act imposes a concrete, non-speculative burden on the expression at issue in all or a substantial number of its applications. *See Bonta*, 594 U.S. at 615; *AZ Petition Partners*, 255 Ariz. at 259 ¶ 17. A challenger making a facial challenge may not rely solely on its own circumstances. *See Doe*, 561 U.S. at 200 (rejecting a facial challenge where plaintiffs' argument "rests almost entirely on the specific harm they say would attend disclosure of the information on the [referendum] petition" or "similarly controversial" referendum petitions but not all petitions).

¶88    The amended complaint and attendant declarations allege harms only as to Plaintiffs themselves. CAP and FEC describe prior harassment and intimidation in connection with their issue-advocacy activities and assert that disclosure of their donors' identities would expose donors to similar reprisals, thereby reducing contributions. Consequently, CAP is "considering" refraining from campaign media spending, and FEC is "likely" to do so. The Doe Plaintiffs allege they will limit or eliminate contributions to organizations that engage in issue advocacy or campaign media spending to avoid perceived risks of retaliation.

¶89    Even accepted as true, these allegations describe only how disclosures might burden Plaintiffs. The amended complaint includes no factual allegations about donors to other organizations, about other charities or advocacy groups subject to the Act, about upstream

contributors, or about whether the Act's application to most campaign media spending would expose contributors to harassment or intimidation.

**¶90** Plaintiffs' bare assertion that the Act "penalizes and deters speech" by Plaintiffs "and other similar organizations [to CAP and FEC]" is both limited and conclusory. It does not identify those other organizations, the kind of campaign media they fund, whether they engage in controversial expression, or whether disclosure poses any realistic risk of reprisal to donors. Conclusory statements cannot satisfy the requirement that a facial challenger show that a substantial amount of protected expression is chilled by the law. *See Coleman*, 230 Ariz. at 356 ¶ 9; *see also Doe*, 561 U.S. at 194 (stating that "[t]he label" facial invalidity "is not what matters" and concluding that challengers' proof must "reach beyond the[ir] particular circumstances").

**¶91** At oral argument here, Plaintiffs argued that the Act categorically chills speech because *all* compelled disclosures restrain free expression. *See Bonta*, 594 U.S. at 615 (finding a categorical burden where the defect was present "in every case"). But nothing in the amended complaint or the declarations supports that disclosure in the vast majority of campaign media spending in elections, many of which concern nonpolarizing matters, creates a credible risk of harassment, intimidation, or compelled ideological association. And the potential chilling effect for substantially all applications of the Act is not self-evident. *See AZ Petition Partners*, 255 Ariz. at 259 ¶ 19. Donors supporting campaign media spending for ordinary ballot measures, municipal candidates, bond elections, or budget issues, for example, are not inherently subject to retaliation. *See Doe*, 561 U.S. at 200 (noting that many ballot measures concern routine matters such as tax policy or budgeting, where disclosure of petition signers is unlikely to result in reprisals).

**¶92** The dissent responds that "Americans see politically motivated violence as on the rise in the United States" and that many attribute that violence to political polarization. *Infra* ¶ 193. It points out that "several public officials and political figures have been the targets of horrific acts of violence" in recent years. *Infra* ¶ 193. But the dissent does not suggest that such violence or intimidation is a feature of a substantial number of campaigns or donor disclosures falling within the Act's legitimate sweep, and that is the critical inquiry in a facial challenge. *See Bonta*, 594 U.S. at 615. Nor could it easily do so.

¶93        Since statehood, and continuing today, Arizona law has long required election-related disclosures, *see supra* ¶ 3 n.1, and Arizona maintains public reporting systems for campaign finance and Voters Right to Know filings. *See* See the Money, Arizona Secretary of State, seethemoney.az.gov (last visited March 21, 2026) (providing an Arizona-specific searchable database for candidate, political party, ballot measure, and other donations by year); Voters Right to Know Act (VRKA) Reporting, Arizona Secretary of State, azsos.gov/elections/campaign-finance/vrka-reporting (last visited March 21, 2026) (reporting donations under the Act). Yet neither the dissent nor Plaintiffs suggest that a substantial number of these disclosures within the laws' legitimate sweep have exposed donors to violence or intimidation so as to chill speech. On the contrary, donors continue to make significant donations for candidates and ballot measures alike. *See id.* If a reasonable probability exists in a specific circumstance that disclosure required by the Act would subject donors to "threats, harassment, or reprisals" so that donations, and thus speech, would be chilled, the matter should be adjudicated in an as-applied challenge. *See Doe*, 561 U.S. at 201.

¶94        The Speak Freely Clause indisputably protects unpopular, controversial speech, and our analysis here does not, as the dissent asserts, suggest otherwise. *See infra* ¶ 193. Our point is procedural: a facial challenge requires showing that a substantial number of the Act's applications are unconstitutional, and the dissent's citation to perceived political violence—however real and troubling—does not establish that disclosure under the Act exposes donors to harassment or retaliation in a substantial number of its applications across the full range of elections and ballot measures it covers.

¶95        The dissent also argues that the Act's twenty-one-day opt-out period "censors" speech protected by the Speak Freely Clause when triggered in the final weeks before an election. *See infra* ¶¶ 174, 177. It asserts that "when a covered person decides to use donations to engage in campaign media spending three weeks (or less) before election day, the Act will *altogether prohibit* that core political speech due to insufficient time to provide and receive opt-out notice responses." *Infra* ¶ 177. That argument fails at the threshold and again on the merits. Most fundamentally, although CAP and FEC correctly allege they are unable to use donations during the opt-out period absent an opt out, they do not allege—even considering Arizona's notice-pleading standard—that the

Act's opt-out timeline will prevent them and others from speaking in the days or weeks preceding an election.   Nor is there a plausible allegation that the scenario the dissent posits arises in a substantial number of cases relative to the Act's legitimate sweep, as a facial challenge requires.   To the extent it arises in a particular case, it is properly addressed through an as-applied challenge, in which a court may enjoin enforcement of the opt-out waiting period as applied to that covered person.

¶96        The argument is also speculative on its own terms.   It assumes that covered persons exceeding the Act's spending thresholds, more than $50,000 statewide or $25,000 locally, finance campaign media on a donation-by-donation basis in the closing weeks of a campaign, rather than from funds previously raised and held.   In any event, the Act permits a covered person to obtain a donor's permission to use a contribution for campaign media spending before the donation or at any time before expiration of the twenty-one-day period.   *See* § 16-972(C).   If the donor opts out, the funds could not have been used for campaign media anyhow; if the donor affirmatively permits that use earlier, such as at the time of the donation, the covered person suffers no restraint.   Under either scenario, the opt-out timeline does not operate as a restraint on speech, much less as a form of censorship.   *See Doe*, 561 U.S. at 196 ("[D]isclosure requirements do not prevent anyone from speaking." (alteration in original) (quoting *Citizens United*, 558 U.S. at 366) (cleaned up)).

¶97        Because Plaintiffs have not plausibly alleged that the Act burdens protected expression in all or a substantial number of its applications, they have not sufficiently alleged a claim for facial invalidity under the Speak Freely Clause.   Having failed to satisfy this threshold requirement, Plaintiffs have not triggered the State's obligation to show that the Act's burdens are reasonable under the Arizona-specific standard described above.   *See supra* ¶¶ 55–56.   Without a factual showing (or allegation, here) of a widespread burden, there is no "undue burden" to justify in a facial challenge.   We therefore do not address the parties' arguments regarding that issue, including whether the Act goes further than reasonably necessary to advance the government's interest.

### D.   The Definition Of "Campaign Media Spending" Does Not Make The Act Overbroad And Facially Vague

¶98        As previously explained, *see supra* ¶ 19–20, a statute is fatally overbroad under the Speak Freely Clause "if a substantial number of its

applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bonta*, 594 U.S. at 615 (quoting *Stevens*, 559 U.S. at 473). We will void a statute as unconstitutionally vague if it fails to give sufficient notice of what the law prohibits or "is so indefinite as to allow arbitrary and discriminatory enforcement," although "perfect clarity is not required even when a law regulates protected speech." *See Brumsickle*, 624 F.3d at 1019 (first quoting *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554 (9th Cir. 2004); and then quoting *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001)).

**¶99** The Act defines "campaign media spending," in pertinent part, as "mean[ing] spending monies or accepting in-kind contributions to pay for any of the following . . . [r]esearch, design, production, polling, data analytics, mailing or social media list acquisition or any other activity conducted in preparation for or *in conjunction with*" elsewhere-enumerated types of paid "public communications." § 16-971(2)(a)(vii) (emphasis added). Plaintiffs contend that the italicized language makes the Act both overbroad and unconstitutionally vague, leaving people to "guess" about its meaning and sweeping in too many expressive acts.

**¶100** Plaintiffs rely heavily on *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1237–38 (10th Cir. 2023), which concerned a law requiring organizations to disclose contributions "which relate to" electioneering communications. The plaintiff gun rights group deposited all contributions into one general fund and lacked any earmarking system, prompting the court to conclude that the law was impermissibly vague as applied to the group because it meant the state could subjectively and arbitrarily decide which donations "relate[d] to" electioneering communications. *See id.* at 1237–38, 1247.

**¶101** In assessing tailoring under the federal exacting scrutiny standard, the court also rejected the state's suggestion that the group could simply disclose *all* donors, explaining that this approach would sweep in persons who did not support the group's election messages. *See id.* at 1247–48. Plaintiffs and the dissent argue that because the Act likewise does not require earmarking, it is overbroad. *See infra* ¶ 242.

**¶102** *Wyoming Gun Owners* is distinguishable. The phrase "relate to," which the court labeled "bare" and "standardless," provided no textual limits. *See Wyo. Gun Owners*, 83 F.4th at 1237–38. By contrast, § 16-971(2)(a)(vii) is cabined by the surrounding text. Applying the

interpretive canon *noscitur a sociis*, which provides that a word or phrase draws meaning from its surrounding terms, the phrase "any other activity conducted in preparation for or in conjunction with" is informed by the specifically listed activities: research, design, production, polling, data analytics, and list acquisition. *See City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, 211 ¶¶ 13–14 (2019) (applying *noscitur a sociis* to interpret the phrase "otherwise dispose of" by relating it to the surrounding terms "sell, lease, assign," and "mortgage"). Read in context, the provision reaches only to like expenditures that form part of a discrete chain of activities leading to campaign media. It does not extend to remote, tangential, or generic advocacy activities. This contextual narrowing defeats Plaintiffs' vagueness claim by ensuring that the Act operates within the bounds of the governmental interest it serves.

¶103 Nor does the Act's lack of an earmarking requirement render it facially overbroad. *Wyoming Gun Owners* did not hold that earmarking is constitutionally necessary. *See Rio Grande Found.*, 154 F.4th at 1235 (Eid, J., dissenting) (acknowledging that *Wyoming Gun Owners* did not "categorically require legislatures to include an earmarking provision to survive narrow tailoring in the disclosure context"). Rather, it remarked that earmarking "could have" been one tailoring option, while expressly declining to mandate such a mechanism. *See Wyo. Gun Owners*, 83 F.4th at 1248–49 & n.8. Courts have upheld donor-traceback laws similar to the Act's where donors may opt out of funding election communications. *See Gaspee Project v. Mederos*, 13 F.4th 79, 89–90 (1st Cir. 2021); *see also No On E*, 85 F.4th at 506–11 (upholding "true source" disclosure against similar objections). Unlike the law in *Wyoming Gun Owners*, the Act employs tailoring tools: high-spending thresholds, donor thresholds, an opt-out mechanism, and a focus on original sources whose funds are actually and purposefully used for campaign media. *See* A.R.S. §§ 16-971(18)(a), -972(B), -973(A), (A)(6). These tools maintain the Act's focus on identifying persons who provide major funding for campaign media and prevent the Act from sweeping too broadly.

¶104 In short, the challenged definitional language neither invites arbitrary enforcement nor sweeps in a substantial amount of protected expression relative to the Act's plainly legitimate reach. The Act's structure, textual limitations, and built-in narrowing features provide sufficient clarity and tailoring. Any remaining concerns about how the Act operates in specific circumstances are better addressed in as-applied challenges, not through facial invalidation.

### E. Plaintiffs Have Not Alleged A Legally Valid Facial Challenge Under The Privacy Clause

**¶105**       Plaintiffs next argue that the Act is facially unconstitutional under article 2, section 8 of the Arizona Constitution, the "Private Affairs Clause," which provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."   They contend that donating to an organization that uses those monies to fund campaign media is a "private affair" the Act impermissibly disturbs.

**¶106**       Arizona adopted the Private Affairs Clause verbatim from Washington's constitution.   *Mixton*, 250 Ariz. at 290 ¶ 29.   To resolve challenges under the Private Affairs Clause, we agree with the Washington Supreme Court that courts should first consider whether the complained-of action disturbed a person's private affairs.   *See State v. Miles*, 156 P.3d 864, 867 ¶ 11 (Wash. 2007).   If not, the inquiry ends.   If it does, we "ask[] whether 'authority of law' justifies the intrusion."   *Id.*; *see also Rasmussen v. Fleming*, 154 Ariz. 207, 216 (1987) (holding that the right to refuse medical treatment, though a private affair, "is not absolute" and may yield to state interests).

**¶107**       We begin by asking whether donating to an organization to fund campaign media, or later authorizing a donation for that purpose, qualifies as a "private affair."   Although we have most often applied the Private Affairs Clause in the criminal-search context, we have recognized that its protection extends beyond that setting.   *See Rasmussen*, 154 Ariz. at 214–15 (holding that decisions concerning medical treatment fall within the scope of "private affairs").

**¶108**       Because the Constitution does not define "private affairs," we look to the term's natural meaning at the time of adoption.   *Mixton*, 250 Ariz. at 290 ¶ 33.   In *Mixton*, we consulted early twentieth-century dictionaries, which defined "private" as "affecting or belonging to private individuals, as distinct from the public generally," or as "peculiar to one's self; personal; alone; secret; not public; secluded; unofficial."   *Id.* (first quoting *Private*, Black's Law Dictionary (2d ed. 1910); and then quoting *Private*, New Websterian Dictionary (1912)).   The term "affairs" was understood to mean "a person's concerns in trade or property; business."   *Id.* at 291 ¶ 33 (quoting *Affair*, Black's Law Dictionary (2d ed. 1910)).

**¶109** We recognized in *Mixton*, however, that "private affairs" remains "an ambiguous concept that eludes precise demarcation," and explained that its meaning must be discerned from the Clause's context, language, subject matter, historical background, effects and consequences, and spirit and purpose. *Id.* We further concluded that the Clause protects only those privacy interests that society is prepared to recognize as reasonable. *See id.* at 292–93 ¶¶ 40–41. Applying that principle, we concluded that IP addresses and subscriber information are not "private affairs" because users voluntarily share that information with third-party service providers who own and routinely use it. *Id.* at 295 ¶ 51.

**¶110** Similarly, the identities of persons who donate money or in-kind services to fund campaign media are not "private affairs." Elections are matters of profound public concern, and efforts to influence them, including by making financial contributions, have long been regulated and treated as public, not private, acts. *See Beason v. Shaw*, 42 So. 611, 612 (Ala. 1906) ("The election was not a matter of private, but of public, concern."). As explained previously, Arizonans at statehood embraced transparency in election-related spending as a constitutional value. *See supra* ¶¶ 63–74. That understanding is incompatible with treating donors' contributions for campaign media as private affairs shielded from disclosure. Just as the framers did not view election-related contribution disclosures as an infringement of the right to speak freely, they did not view it as a disturbance of a private affair. Because donations to fund campaign media do not fall within the scope of article 2, section 8, Plaintiffs' facial challenge under the Privacy Clause fails.

**¶111** Finally, even assuming these donations constitute private affairs, the Act itself may qualify as "authority of law" sufficient to justify a disturbance of those affairs. *See* Ariz. Const. art. 2, § 8. The Clause does not, as the dissent suggests, limit lawful governmental access to circumstances requiring a warrant or subpoena. *See infra* ¶ 257. Instead, it prohibits disturbance of private affairs "without authority of law." That language naturally encompasses duly enacted statutes, which are classic sources of legal authority.

**¶112** Importantly, however, a statute's mere existence does not validate its own constitutionality—otherwise the Legislature could evade the Private Affairs Clause by simply enacting a law. *Rasmussen* is instructive. There, we held that the Private Affairs Clause protects an individual's right to refuse medical treatment but recognized that the right

is not absolute; it may yield where state interests are sufficient to outweigh the privacy interest at stake. *Rasmussen*, 154 Ariz. at 216. Although *Rasmussen* involved non-statutory state action, the principle that disturbances require justification does not turn on the statutory or non-statutory character of the disturbance. *Cf. Miles*, 156 P.3d at 867 ¶ 11. Whether the Act would survive that justification inquiry is a question we need not reach. Plaintiffs' facial claim fails at the threshold because donations to fund campaign media are not "private affairs" within the meaning of the Clause.

### F. Plaintiffs Have Sufficiently Alleged An As-Applied Challenge

¶113 Plaintiffs argue the Act is unconstitutional as applied to them under both the Speak Freely Clause and the Private Affairs Clause. An as-applied challenge assumes that a law is generally constitutionally valid and enforceable. *See Smith v. Fontes*, 260 Ariz. 201, 206–07 ¶ 26 (2025). To prevail, the Plaintiffs must show that the Act has been or is likely to be unconstitutionally applied to them. *See McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014); *Smith*, 573 P.3d at 98-99 ¶ 26.

### 1. Plaintiffs Have Not Sufficiently Alleged An As-Applied Claim Under The Private Affairs Clause

¶114 Plaintiffs argue that publicly disclosing major donors for independent campaign media intrudes on donors' private affairs. CAP and FEC allege they qualify as covered persons, not as donors, and they do not otherwise claim that the Act intrudes on their private affairs. The as-applied challenge therefore rests on the allegations of the Doe Plaintiffs, who must plausibly allege that the Act, as applied to them, actually disturbs a protected private affair. *See McCullen*, 573 U.S. at 485 n.4; *Smith*, 573 P.3d at 98–99 ¶ 26.

¶115 As previously explained, donating to organizations to fund campaign media does not constitute a "private affair" within the meaning of article 2, section 8. *See supra* ¶ 110. Nor are the Doe Plaintiffs upstream donors unaware that their contributions may ultimately be used for campaign media spending. On the contrary, they have historically donated directly to organizations that would qualify as covered persons under the Act. Per the Act, the Doe Plaintiffs would therefore receive notice and have the opportunity to opt out of having their contributions

used for campaign media.   *See* A.R.S. § 16-972(B)–(C).   If they instead permit their contributions to be used for that purpose, they are engaging in public, not private, activity.   The superior court thus correctly dismissed the Plaintiffs' as-applied claims under the Private Affairs Clause.

### 2.   Plaintiffs Have Sufficiently Alleged An As-Applied Challenge Under The Speak Freely Clause

¶116      Under step one of the Arizona-specific standard, Plaintiffs sufficiently alleged that expression is at issue.   *See supra* ¶¶ 60–62. Moving to step two, Defendants have shown that the Act's disclosure requirements meaningfully further election integrity and transparency. *See supra* ¶¶ 63–74.   Before considering whether Plaintiffs have sufficiently alleged that the Act nonetheless imposes an unreasonable burden on expression, we first ask whether they have plausibly alleged, as a threshold matter, that the Act imposes a concrete, non-speculative burden or hindrance on expression or compels them to convey views they do not endorse.   *See supra* ¶¶ 54–56.

¶117      Plaintiffs allege that the Act's disclosure requirements burden their expressive acts.   A disclosure law may be unconstitutional as applied against a party if the party pleads a "reasonable probability" that publicly identifying contributors who fund election-related messaging "will subject them to threats, harassment, or reprisals from either Government officials or private parties."   *Citizens United*, 558 U.S. at 367 (citation modified).   A party may satisfy its burden by showing "specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself."   *Buckley*, 424 U.S. at 74.   "A pattern of threats or specific manifestations of public hostility" may also be sufficient.   *Id.*   And if a party is a new entity, it may meet its burden by offering evidence of threats, harassment, or reprisals against individuals or organizations with similar views.   *Id.*

¶118      At this early stage, CAP and FEC have sufficiently alleged a concrete, non-speculative burden on protected expression.   Because the Act does not impact donations used for purposes other than campaign media, CAP and FEC have not plausibly alleged that the Act reduces their ability to publicly communicate messages outside that context.   They do allege, however, that the prospect of public identification under the Act will cause major donors to fear harassment and retaliation, deterring them from contributing sufficient money and resources needed for CAP and FEC to

engage in campaign media related to their issue advocacy. As a result, CAP and FEC allege that the Act "chills" their speech by forcing them to curtail their campaign media messaging.

¶119 CAP and FEC ground these allegations in concrete facts. In declarations submitted with the amended complaint, both organizations describe specific instances of threats and harassment directed at them and their staff in response to their issue advocacy. *See Coleman*, 230 Ariz. at 356 ¶ 9 (stating that a complaint's exhibits can be considered in deciding a Rule 12(b)(6) motion). CAP recounts receiving communications stating, for example, "Sooner or later, you will die, and some of us pray it is sooner," and "You are a cancer that will soon be sliced out of our nation's sick body. I will make it my personal mission to bury every single one of you." FEC likewise reports that staff members "have received numerous phone calls and voicemails" threatening violence because of FEC's expressive activities, and that a staff member's car was vandalized in retaliation for communicating FEC's message. CAP and FEC also point to the Doe Plaintiffs' declarations, which confirm that these individuals will limit their donations to organizations like CAP and FEC to avoid disclosure.

¶120 Taken as true at this early stage, these allegations are minimally sufficient to make a threshold showing that the Act's disclosure provisions impose a concrete, non-speculative burden on CAP's and FEC's expressive activities. To be sure, CAP and FEC do not identify specific instances in which harassment was tied to funding campaign media; they do not allege harassment directed at donors themselves; and their affiliated political action committees have publicly disclosed donor identities without apparent adverse consequence. But these considerations do not defeat their claim at the pleading stage. *See State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 594 (1983) (stating that motions to dismiss for failing to state a claim are disfavored and should only be granted if "it appears certain" that the plaintiff would not be entitled to relief if it proves the pleaded facts). Because major donors who funded campaign media were not publicly identified before the Act's enactment, it would be unreasonable to require covered persons to allege past harassment that could not have occurred. And where an organization plausibly alleges a reasonable probability of threats or retaliation arising from its issue advocacy, which is presumably closely related to its campaign-related speech, it is a reasonable inference, at least for threshold purposes, that similar risks may attend the compelled public identification of the major donors who finance that speech. Any weaknesses in CAP's and FEC's allegations, including

whether they can ultimately link a reasonable possibility of harassment or retaliation to specific campaign media, go to the degree of burden imposed by the Act, not whether a cognizable burden has been plausibly alleged. *See Stummer*, 219 Ariz. at 145 ¶¶ 28–30.

**¶121**          We reach a similar conclusion regarding the Doe Plaintiffs' as-applied claims under the Speak Freely Clause.   Each alleges that, during past election cycles, and with the expectation that their identities would remain confidential, they donated more than $5,000 to nonprofit organizations who publicly advocate through campaign media.   Doe I describes donations supporting campaign media on highly contentious social issues, including abortion policy, transgender issues, same-sex marriage, and school choice.   He further avows that he is aware of instances in which individuals and organizations supporting similar views have been subjected to harassment, including an attempted firebombing of a pro-life organization.   Doe II does not describe the specific advocacy engaged in by the recipient organizations or whether supporters of that advocacy have previously been harassed.   Both Doe Plaintiffs nonetheless declare that public identification under the Act would expose them and their employers to harassment, retaliation, or other harms, and that they therefore intend to limit future donations.

**¶122**          Taken as true at this stage, these allegations are minimally sufficient to make a threshold showing that the Act's disclosure provisions impose a concrete, non-speculative burden on the Doe Plaintiffs' expressive activities.   We acknowledge that neither Plaintiff identifies the organizations to which they have contributed or plan to contribute; explains whether those organizations have supported or opposed, or are likely to support or oppose, candidates or ballot measures that generate widespread controversy; or alleges a history of harassment directed at those organizations, their supporters, or similarly situated donors.   But, as with CAP's and FEC's allegations, these shortcomings go to the degree of burden imposed by the Act, not to whether a cognizable burden has been plausibly alleged at the pleading stage.   *See id.*

**¶123**          We therefore turn to whether Defendants have demonstrated, as a matter of law at the pleading stage, that the burden on expression is not unreasonable so as to interfere with Plaintiffs' right to speak "freely." *See supra* ¶ 55–56.   As explained above, the reasonableness of the burden turns on the importance of the governmental interest at stake, whether the Act furthers that interest, and the degree to which the Act burdens or

hinders expression.  *See supra* ¶ 55–56.   On the limited record before us, we cannot conclude as a matter of law that the Act does not impose an unreasonable burden on Plaintiffs' expressive activities when those activities involve highly contentious campaign media, and the allegations support a reasonable probability that public disclosure of major donors would expose them to harassment, reprisals, or other harms that would deter future contributions.   We are also mindful that the parties have not yet had an opportunity to address the reasonableness of that burden under our Arizona-specific framework.   For these reasons, we reverse the superior court's dismissal of Plaintiffs' as-applied claim under the Speak Freely Clause and remand for further proceedings.

## CONCLUSION

**¶124**        For the foregoing reasons, we vacate the court of appeals' opinion, except ¶¶ 66–71 which resolve an issue on which Plaintiffs did not seek review in this Court.   We affirm the superior court's dismissal of Plaintiffs' claim that the Act is facially unconstitutional under the Speak Freely Clause and the Private Affairs Clause.   We also affirm the dismissal of Plaintiffs' as-applied claims under the Private Affairs Clause.   But we reverse the dismissal of their as-applied claims under the Speak Freely Clause.   We therefore remand to the superior court for further proceedings on that claim consistent with this opinion.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

KING, J., joined by LOPEZ, V.C.J., and BOLICK, J., concurring in part and dissenting in part:

**¶125** Plaintiffs are two non-profit organizations and two anonymous individuals who donate to organizations. The trial court dismissed their legal challenge to the Voters' Right to Know Act in its entirety during a preliminary stage of the case. *See* Voters' Right to Know Act, Proposition 211 § 2 (2022) (hereinafter the "Act"). Our task today is solely to determine whether that court erred in dismissing Plaintiffs' facial and as-applied constitutional challenges to the Act for "failure to state a claim upon which relief can be granted." Ariz. R. Civ. P. 12(b)(6).

**¶126** Arizona has a "notice pleading standard, the purpose of which is to 'give the opponent fair notice of the nature and basis of the claim and indicate generally the type of litigation involved.'" *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419 ¶ 6 (2008) (quoting *Mackey v. Spangler,* 81 Ariz. 113, 115 (1956)). In determining if a complaint states a claim upon which relief can be granted, courts must assume the truth of all well-pleaded factual allegations and indulge all reasonable inferences from those facts. *Id.* ¶ 7. A complaint should only be dismissed under Rule 12(b)(6) if the "plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof." *Coleman v. City of Mesa*, 230 Ariz. 352, 356 ¶ 8 (2012) (quoting *Fid. Sec. Life Ins. Co. v. State Dep't of Ins.*, 191 Ariz. 222, 224 ¶ 4 (1998)).

**¶127** The premise of the Act—transparency with respect to "all major" donations ultimately used for campaign media spending—may at first glance seem innocuous to the constitutional rights of Arizonans. *See* Act § 2(A). But after examining the mechanics of how the Act operates and applies to Arizonans, it is clear that Plaintiffs have stated viable claims under the Arizona Constitution at this early stage. *See* Ariz. Const. art. 2, § 6 ("Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.") (the "Speak Freely Clause"); *id.* art. 2, § 8 ("No person shall be disturbed in his private affairs . . . without authority of law.") (the "Private Affairs Clause").

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

**¶128**   We concur with the majority's conclusion that Plaintiffs' as-applied challenge under the Speak Freely Clause should not have been dismissed. But we depart from the majority in all other respects.

**¶129**   The majority acknowledges that the Act's provisions implicate speech rights under the Speak Freely Clause, and the Clause tolerates no censorship or restraint, major or minor, on the right to speech. *Supra* ¶¶ 47, 60–62. Indeed, the Speak Freely Clause contains a *single* textual limitation on every person's affirmative right to freely speak: "being responsible for the abuse of that right." But the majority creates a new limitation on free speech rights, permitting censorship and restraint on speech in "the state's proper exercise of its regulatory authority." *Supra* ¶¶ 47–48. Most fundamentally, this police power justification departs from clear constitutional text that limits the scope and exercise of legislative authority infringing on the right to speak freely to "abuse of that right." But this police power justification is also nebulous and sweeping, invites government suppression of speech, and is unprecedented.

**¶130**   The majority also permits censorship and restraint on speech pursuant to a state constitutional directive. *Supra* ¶¶ 47–48. We agree that a provision in the Arizona Constitution should be read in the context of the whole constitution, and a partially conflicting constitutional provision could mean the framers intended an exception to the general rule. But we cannot rely on constitutional provisions that are wholly inapplicable to the Act's regulations, as the majority does here, to override the Speak Freely Clause's explicit speech protections. The Act mandates the disclosure of donations to non-profit organizations that are not controlled by, and do not coordinate with, candidates or their campaign committees. To be clear, there is *no* Arizona constitutional directive that requires or authorizes public disclosures of donations made to organizations that are not candidates or campaign committees.

**¶131**   The majority's interpretation undermines the framers' explicitly broad speech protections. By focusing on the text of the Speak Freely Clause, as we should, it is clear that Plaintiffs have sufficiently alleged a substantial number of unconstitutional applications. Plaintiffs have sufficiently alleged that the Act (1) effectuates a prior restraint on and censors core political speech during a critical period leading up to an

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

election; (2) effectuates compelled speech and compelled association through a flawed opt-out system; and (3) is vague and overbroad and has a chilling effect on speech. Plaintiffs' facial challenge under the Speak Freely Clause should not have been dismissed under Rule 12(b)(6).

¶132 As to the Private Affairs Clause, we conclude that Plaintiffs have sufficiently alleged at this early stage that confidential donations to non-profit organizations are private affairs, and that the Act, both facially and as applied to them, disturbs private affairs without authority of law.

¶133 The dismissal of Plaintiffs' complaint at this early stage unjustly denies them the opportunity to seek information from Defendants and third parties through the discovery process and, with the benefit of such information, the opportunity to litigate the substantive merits of their claims. The complaint should not have been dismissed under Rule 12(b)(6).

¶134 Before proceeding, we pause to note that the majority opinion transforms Arizona jurisprudence beyond the important issues presented here. As to the Speak Freely Clause, for the first time in Arizona history, the majority suggests that the Clause in some instances is less protective of free speech than its federal counterpart, and it does so in the context of political speech, which occupies the apex of free speech guarantees. The majority also introduces into our jurisprudence an ill-defined police power justification for infringements on speech, wholly divorced from any abuse. And as to the Private Affairs Clause, the majority suggests for the first time that the Clause may be subject to limitation by the very laws it was designed to forbid.

¶135 Our disagreement with the majority is not based on policy grounds. Instead, our disagreement is one of constitutional magnitude about the meaning of two constitutional provisions in Arizona's Declaration of Rights. What the Act compels people to do, and what it forbids them from doing, is what makes for the profound constitutional implications that we describe next. *See Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 357 (1989) ("The framers of our constitution did not give our judges authority to censor speech or decide

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

how much speech the constitution allows . . . . Instead, the framers gave every person the right to 'freely speak, write and publish' and made judges responsible to uphold and enforce those rights.").

## A. The Act And Its Application To Arizonans

**¶136** We agree with our colleagues' observations about the Act's "complexity" and its failure to make clear how certain provisions operate. *Supra* ¶¶ 3, 82. The Act's provisions are even more complicated and sweeping than may initially appear. Thus, we begin by detailing the Act's key provisions, how those provisions operate and apply to the people of Arizona, and what is (and is not) at issue in this case.

**¶137** Under the Act, "covered persons" are individuals or entities who act independently of a particular candidate or ballot measure and spend in an election cycle, through donor or in-kind contributions, more than $50,000 on campaign media spending in a statewide campaign or $25,000 in other campaigns. A.R.S. § 16-971(7), (13). The public disclosure of a covered person who engages in such campaign media spending is not at issue in this case. *See* A.R.S. §§ 16-971(7), -973(A)(1).

**¶138** At issue here is the Act's requirement that covered persons file reports with the Secretary of State that identify all persons and entities who donated, directly or indirectly, more than $5,000 throughout an election cycle (a two-year period) that was ultimately used by the covered person for campaign media spending. §§ 16-971(8), -973(A)(6). "Campaign media spending" is broadly defined, covering expenditures for public communications that promote, support, attack, or oppose a candidate, initiative, referendum, or recall of a public officer and "any other activity conducted . . . in conjunction" with such public communications. *See* § 16-971(2)(a)(vii).

**¶139** The required disclosures to the Secretary of State must include: (1) in the case of direct and indirect donors who are individuals, those peoples' names, addresses, occupations, and the identities of their employers; and (2) in the case of direct and indirect donors that are entities,

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

the entities' names, mailing addresses, and other information (collectively "Detailed Personal Information").   § 16-971(10).

**¶140**        The Act mandates that covered persons disclose Detailed Personal Information about donors who have directly contributed to the covered person ("Direct Donors").   But the disclosure requirements are not limited to immediate Direct Donors.   The Act also requires covered persons to disclose Detailed Personal Information about donors whose funds indirectly made their way to the covered person ("Indirect Donors").   §§ 16-971(10), -973(A)(6).   The Indirect Donor scenario arises when, for example, a person contributes funds to one organization, that organization then contributes those funds to a second organization, the second organization then contributes those funds to a third organization, and so on until the funds ultimately reach a covered person who independently decides to use the funds for campaign media spending.   In that case, the person and all organizations are Indirect Donors under the Act (except the last donating organization, which is a Direct Donor).   §§ 16-971(10), -973(A)(6).[8]

**¶141**        Notably, the Act's Detailed Personal Information disclosure requirements are in place for all upstream Indirect Donors, regardless of how many times the funds have been donated from one organization to another and without the Indirect Donor ever designating (i.e., earmarking) the funds to be used for campaign media spending, much less for a particular candidate, ballot measure, or message.   In essence, the earlier donors become automatically responsible for subsequent grantees' completely independent use of the funds.

**¶142**        The Act is not limited in application to those who donate more than $5,000.   The Act also requires covered persons to retain records of the identity of each person who directly or indirectly contributed or transferred more than $2,500 during an election cycle that was ultimately used for campaign media spending.   A.R.S. §§ 16-971(12), (19), -972(A).

---

[8]   Such Detailed Personal Information must also be disclosed for any person who acted as an intermediary and transferred more than $5,000 from original sources to the covered person.   *See* §§ 16-971(10), -973(A)(7).

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

Those records must be retained for five years and provided to the Citizens Clean Elections Commission (the "Commission") upon request.  *Id.*  The Act does not require the Commission to maintain the anonymity of these lower-level contributors, nor does it exempt the list of names from disclosure under Arizona's public records laws.  *See* A.R.S. § 39-121 ("Public records . . . in the custody of any officer shall be open to inspection by any person at all times during office hours.").  Thus, the identities of those who directly or indirectly donated merely $2,501 used by covered persons for campaign media spending over the course of an entire election cycle are subject to disclosure in connection with the campaign media spending.

**¶143**        The Act contains an "opt-out" provision ostensibly designed to protect donor choice.   But its structural flaws thwart that purpose and severely limit core political speech.   The opt-out provision works as follows: Before a covered person may use funds for campaign media spending, the covered person must notify the donor that (1) the contribution may be used "for campaign media spending," (2) information about the donor may have to be disclosed to the public, and (3) the donor "can opt out of having their monies used or transferred for campaign media spending."   § 16-972(B), (C).   The donor has "twenty-one days after receiving notice" to respond to it.   *Id.*

**¶144**        During the opt-out notice's waiting period—which is more than twenty-one days to account for mail time—the covered person is strictly prohibited from using the donor's funds for campaign media spending, unless the donor happens to provide written consent earlier. § 16-972(C).   As designed, therefore, the opt-out provision altogether halts core political speech for weeks at a time in the critical period leading up to an election—when free speech is of the utmost importance.  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

**¶145**        Moreover, while the opt-out notice identifies the possibility of "campaign media spending" generally, it need not identify the candidate, ballot measure, or message the donor's funds will support or oppose in campaign media spending.   § 16-972(B).   The notice, therefore, may lack the most critical information for a donor to make an informed choice.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

¶146 Further, the specific opt-out provision, § 16-972(B), does not expressly require that covered persons provide opt-out notices to upstream Indirect Donors, and thus does not guarantee that upstream Indirect Donors receive opt-out notices. § 16-972(B), (C). And donors have no statutory obligation to pass along opt-out notices to their own donors. As the Commission observed, "[t]he plain text of the Act does not impose on a donor who is not a covered person an obligation to provide the notice to those who may donate to that donor." Citizens Clean Elections Commission Advisory Opinion, 2024-02, at 9.

¶147 The majority contends that a "better interpretation [of the Act] is that opt-out status remains a condition of disclosure." *Supra* ¶ 80. In reaching this conclusion, the majority relies on the Act's reference to "traceable monies" in the disclosure reports provision (§ 16-973(A)(6)), and the Act's definition of "traceable monies" that refers to "monies . . . for which no donor has opted out . . . pursuant to § 16-972" (§ 16-971(18)(a)) — a provision framed in the negative. *Supra* ¶¶ 80–82. But there is no affirmative requirement in § 16-972 or elsewhere in the Act that the upstream Indirect Donor has in fact been provided and has in fact received the opt-out notice before the disclosure of such donor's Detailed Personal Information. The Act does not make an upstream Indirect Donor's actual receipt of an opt-out notice a condition of disclosure.

¶148 Moreover, the majority's interpretation is problematic because "the state must regulate in this area [of free speech] with great precision and an even hand, alerting all to the law's requirements and proscriptions, and leaving little to nothing by way of subjectivity in enforcement." *AZ Petition Partners LLC v. Thompson*, 255 Ariz. 254, 257 ¶ 12 (2023). The majority fails to address the Act's vagueness problems in this context, instead invokes a "better interpretation," *supra* ¶ 80, and relies on a case that does not address free speech issues, *Ariz. Downs v. Ariz. Horsemen's Found.*, 130 Ariz. 550, 554 (1981). Even the majority recognizes that significant questions remain and the Act is not entirely clear "about how its notice and tracing provisions operate in all circumstances" before donors' identities are disclosed. *Supra* ¶ 82. Consequently, we cannot discount the likelihood that upstream Indirect Donors are disclosed as supporting or opposing a candidate, ballot measure, or message without ever receiving an opt-out notice.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

**¶149**        We offer two hypotheticals to demonstrate the Act's application and impact on the people of Arizona, regardless of where they fall along the political spectrum.

**¶150**        A woman donates $5,100 to her church over the course of a year without designating her funds to be used in any way; the church then donates those funds to a social justice organization; the social justice organization then donates those funds to an immigrant relief organization; the immigrant relief organization then donates those funds to an organization that purchases campaign advertisements to advocate for a ballot measure seeking to prohibit local law enforcement agencies from partnering with U.S. Immigration and Customs Enforcement ("ICE"). Under the Act, the woman will be publicly identified as supporting "anti-ICE" campaign media spending, even if she strongly supports ICE.

**¶151**        At two separate fundraising events, a man donates a total of $5,005 to a non-profit organization that supports free speech principles without identifying his funds to be used in any way; the free speech organization then donates those funds to an organization that advocates for civil liberties; the civil liberties organization then donates those funds to an organization that supports individual gun rights. The gun rights organization then engages in campaign media spending to support a ballot measure that seeks to expand individual gun rights under Arizona law. Under the Act, the man will be publicly identified as supporting a "pro-gun rights" message, even if he vehemently supports gun control and increased government restrictions on the purchase and use of guns.

**¶152**        In both instances, the Act publicly identifies these individuals as supporting ballot measures and messages with which they fundamentally disagree. Neither person earmarked their funds to be used in this way. They were never informed that their funds would be used to support the "anti-ICE" and "pro-gun rights" messages and they would be publicly identified as associated with and supportive of these ballot measures and messages. They may have never received opt-out notices due to the Act's lack of clarity; but even if they did, the notices did not identify the measures or messages. And not only are their names reported

58

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

as supporting ballot measures and messages they fundamentally oppose, but their addresses, occupations, and employers are publicly reported too.

¶153        The Act allows a person's identity to be withheld in very limited circumstances.   First, if that identity is protected by law or court order.   § 16-973(F).   Second, if the donor demonstrates to the satisfaction of the Commission a reasonable probability that public knowledge of the donor's identity would subject the donor or his or her family to "a serious risk of *physical harm*" (i.e., harm to the body).   *Id.* (emphasis added).   The Act offers no protection where the disclosure would subject a donor or his or her family to a serious risk of threats, harassment, reprisals, property damage, or other forms of non-bodily harm.   *See id.*   Nor does it provide an expeditious timeframe to ensure the Commission renders a determination in time to guarantee the identity of the person at risk is not disclosed.   *See id.*

¶154        Finally, the Act empowers both the "[Commission] and individual voters to enforce its disclosure requirements" and imposes "significant civil penalties" for failure to comply with its provisions.   *See* A.R.S. § 16-976(A); Act, § 2(D).   The civil penalty can be up to three times the amount of the undisclosed or improperly disclosed contribution. § 16-976(A).

## B.    The Common Structure Of The Constitutional Clauses

¶155        The Speak Freely Clause and Private Affairs Clause share a common structure.   These statehood constitutional provisions are framed in the affirmative with respect to protecting the rights of people to speak freely and not be disturbed in their private affairs.   In doing so, there is a presumption of permissibility as it relates to a person speaking, with a single textual exception that a person may be held "responsible for the abuse of that right."   Ariz. Const. art. 2, § 6.   Additionally, there is a presumption of allowing a person to not be disturbed in his or her private affairs, with a single textual exception where "authority of law" permits such disturbance.   *Id.* art. 2, § 8.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

**¶156**        The structure of these constitutional rights is consistent with the framers' focus on protecting and maintaining individual rights for the people.    *See id.* art. 2, § 1 ("A frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government."); *id.* art. 2, § 2 ("All political power is inherent in the people, and governments . . . are established to protect and maintain individual rights.").    The structure is also consistent with article 2, section 32: "The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise."

## C.   The Speak Freely Clause

### 1.   The Meaning Of The Speak Freely Clause

**¶157**        "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."   *Id.* art. 2, § 6.   This constitutional command "directly grant[s] every Arizonan a broad free speech right," *Mountain States*, 160 Ariz. at 354, and "indicates the Arizona framers' intent to rigorously protect freedom of speech," *State v. Stummer*, 219 Ariz. 137, 142 ¶ 15 (2008).    Indeed, this Court has repeatedly recognized that the text of the Speak Freely Clause demonstrates that it has "greater scope than the [F]irst [A]mendment," which provides only a protection against government action.   *See Mountain States*, 160 Ariz. at 354–55, 357 ("[W]e opt for a more literal application of [the Speak Freely Clause] . . . . [T]he framers gave every person the right to 'freely speak, write and publish' and made judges responsible to uphold and enforce those rights."); *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 282 ¶ 46 (2019) (recognizing that "article 2, section 6 does, by its terms, provide greater speech protection than the First Amendment"); *Stummer*, 219 Ariz. at 144 ¶ 23 (declining to strictly apply federal intermediate scrutiny standard in a Speak Freely Clause case "because it is inconsistent with the broad protection of speech afforded by the Arizona Constitution").

**¶158**        The Arizona Constitution does not define the terms "freely," "speak," "responsible," or "abuse."    "When the Arizona Constitution does not define its terms, we look to their natural, obvious, and ordinary meaning, and our focus is on their meaning at the time the Constitution was adopted."    *State v. Mixton*, 250 Ariz. 282, 290 ¶ 33 (2021) (citation

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

modified); *see also Matthews v. Indus. Comm'n of Ariz.*, 254 Ariz. 157, 163 ¶ 29 (2022). The Speak Freely Clause contains great specificity, and to understand the meaning of those specific terms, we examine dictionary definitions from the time the provision was adopted in 1911. *See Knight v. Fontes*, 261 Ariz. 29, 36 ¶ 20 (2025); *Matthews*, 254 Ariz. at 163–65 ¶¶ 33–37.

**¶159** At the time the Speak Freely Clause was adopted in 1911, "speak" was defined as "to convey sentiments, ideas, or intelligence as if by utterance" and "to express in any way." *Speak*, Webster's International Dictionary of the English Language (1907); *see also Speak*, New Websterian Dictionary (1912) ("[T]o utter articulate sounds; said of human beings; talk; say; utter a discourse or speech; make mention; convey ideas; tell; sound."); *Speak*, Black's Law Dictionary (2d ed. 1910) ("In practice. To argue."). These definitions are consistent with the majority's observation that "to speak" at statehood included both (1) verbalizing ideas and sentiments, and (2) speaking through gestures and other expressive conduct. *Supra* ¶ 61; *see also supra* ¶ 55 (noting "the Speak Freely Clause protects expressive activity broadly").

**¶160** At the time of statehood, "freely" meant "[i]n a free manner; without restraint or compulsion." *Freely*, Webster's International Dictionary of the English Language (1907); *see also Free*, New Websterian Dictionary (1912) ("[W]ithout restraint; at liberty; permitted; liberal; generous; open; free from guilt; independent."); *Free*, Black's Law Dictionary (2d ed. 1910) ("Unconstrained; having power to follow the dictates of his own will. Not subject to the dominion of another" and "assuring liberty; defending individual rights against encroachment by any person or class.").

**¶161** These definitions suggest that to "freely speak" in the Speak Freely Clause means to verbalize or express in any way, including through expressive conduct, one's ideas or sentiments on any subject without compulsion, constraint, or restraint. Textually, the only limitation is that people may be held "responsible for the abuse of that right." Ariz. Const. art. 2, § 6. What does that phrase mean?

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

**¶162**      The definition of "responsible" at the relevant time was "answerable; liable." *Responsible*, New Websterian Dictionary (1912); *see also Responsible*, Webster's International Dictionary of the English Language (1907) ("[L]iable to respond; likely to be called upon to answer; accountable; answerable."); *Responsible*, Black's Law Dictionary (2d ed. 1910) ("To say that a person is 'responsible' means that he is able to pay a sum for which he is or may become liable, or to discharge an obligation which he may be under."). And the definition of "abuse" was "ill-treatment; the excessive or injudicious use of anything; insult; violation." *Abuse*, New Websterian Dictionary (1912); *see also Abuse*, Webster's International Dictionary of the English Language (1907) ("Improper treatment or use; application to a wrong or bad purpose; misuse."); *Abuse*, Black's Law Dictionary (2d ed. 1910) ("Everything which is contrary to good order established by usage" and "improper use."). These definitions suggest that people may be held accountable or liable for abuse of the right, such as by violating the rights of others, violating laws that maintain public order and safety, engaging in conduct giving rise to civil liability, or engaging in criminal misconduct. *See, e.g.*, *Yetman v. English*, 168 Ariz. 71, 82 (1991) (concluding defendant was not protected from defamation claim as "[n]one of the language in [the Speak Freely Clause] even remotely suggests an absolute privilege to damage the reputation of another person"); *Truax v. Bisbee Local, No. 380, Cooks' & Waiters' Union*, 19 Ariz. 379, 394 (1918) (discussing when the right to speak is "abused to the harm of another" and noting that remedies available include "an action for damages" and "a criminal action"); *State v. Lycett*, 133 Ariz. 185, 191 (App. 1982) (concluding speech encouraging others to join pyramid scheme was not constitutionally protected; criminal liability may be imposed for "such inherently fraudulent conduct," as "the number of individuals who would lose their money under such scheme becomes greater as the scheme is allowed to spread").

**¶163**      We do not restrict our review to dictionary definitions, as the majority contends. *Supra* ¶ 33. Our analysis properly recognizes that "we seek to give terms the original public meaning understood by those who used and approved them" and dictionary definitions from when a provision was adopted aid in our examination of that public meaning. *Matthews*, 254 Ariz. at 163 ¶¶ 29, 33. Notably, the majority does not contest the accuracy or applicability of these definitions. Our review also takes account of longstanding Arizona case law that is consistent with these

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

definitions, a point the majority does not dispute. Nothing in the majority opinion demonstrates that the terms "speech," "responsible," or "abuse" mean anything other than what is described above. Moreover, we review other constitutional provisions in place when the Speak Freely Clause was adopted. But, as discussed, those provisions are inapplicable and should not be relied upon to expand the Speak Freely Clause's single textual limitation for "abuse of that right" when examining the Act's provisions.

**¶164** According to the majority, our interpretation of the Speak Freely Clause is incorrect, as "responsible for the abuse of that right" is directed at the speakers, not at lawmakers, and it does not tell lawmakers what categories of expression they may regulate. *Supra* ¶ 43. But the majority's view ignores the first half of the Clause, which declares that every person may freely speak on all subjects. The right to freely speak is an *affirmative right* that can be limited only in the manner specified—for abuse of that right. "Unlike the negative command of the U.S. Constitution's first amendment ('Congress shall make no law abridging the freedom of speech'), the guarantee of this section is stated affirmatively, suggesting it may restrain nongovernmental as well as governmental conduct." John D. Leshy, *The Arizona State Constitution: A Reference Guide* 43 (1993). The majority's interpretation would effectively nullify the Speak Freely Clause's broad speech protections at the hand of government.

**¶165** Also, in *Mountain States*, this Court noted the Corporation Commission has the constitutional authority to regulate public service corporations, but it must do so within the bounds of the Speak Freely Clause. 160 Ariz. at 353–58 (citing Ariz. Const. art. 15, § 3). Likewise, the Legislature has the constitutional authority to enact laws, but it must do so within the bounds of the Speak Freely Clause. *See* Ariz. Const. art. 4, pt. 1, § 1.

**¶166** At bottom, the "right of every person to freely speak, write and publish may not be limited but such a person may be held accountable for an abuse of that right." *Phx. Newspapers, Inc. v. Superior Court*, 101 Ariz. 257, 259 (1966). Thus, any source of restraint on speech—express or otherwise—is anathema to the Speak Freely Clause.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

## 2.  Application Of Speak Freely Clause To Plaintiffs

**¶167**       As discussed, to "freely speak" means to verbalize or express in any way, including through expressive conduct, one's ideas or sentiments on any subject without compulsion, constraint, or restraint. Thus, the Speak Freely Clause protects (1) public communication that promotes, supports, attacks, or opposes a candidate, ballot measure, or message, which is the definition of "campaign media spending," *see* § 16-971(2); (2) spending for campaign media as a form of expressing agreement or disagreement with a candidate, ballot measure, or message; and (3) making a contribution as a form of agreement with, and expression of, the recipient's particular message, policies, or actions.   We agree with the majority that Plaintiffs have adequately alleged that speech and expression protected by the Speak Freely Clause are at issue.   *Supra* ¶ 62.

**¶168**       Further, the Speak Freely Clause does not carve out anonymous speech from protection.   The right to anonymous speech and expression falls within the broad protections of the Speak Freely Clause, a point the majority does not dispute.   *See Mobilisa, Inc. v. Doe*, 217 Ariz. 103, 108 ¶ 11 (App. 2007) (citing *Buckley v. Am. Const. L. Found.*, 525 U.S. 182, 199–200 (1999); *McIntyre,* 514 U.S. at 341–51, 357; *Talley v. California*, 362 U.S. 60, 64–65 (1960)).   By way of example, at statehood, the National American Woman Suffrage Association used anonymously donated funds for its contribution supporting the Arizona women's suffrage ballot measure in 1912.   *See Forty-Fourth Annual Report of the National American Woman Suffrage Association*, at 42 (1912).   Anonymous speech has played a valuable role in our country since its founding, and this principle remained true when the Speak Freely Clause was adopted: "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind.   Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all."   *See Talley*, 362 U.S. at 64.   And although there was a statehood constitutional provision that supported disclosure requirements for donations to candidates and campaign committees, there was not one for the types of disclosures the Act requires. Thus, the Speak Freely Clause protects a person's right to donate anonymously to organizations that are not candidates or campaign committees.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

**¶169**          None of Plaintiffs' speech at issue here constitutes an "abuse of [their] right" to "freely speak"—the sole textual limitation in the Arizona Constitution.   As discussed, donating to an organization with which one agrees was valued at statehood and remains so today—not an abuse. Engaging media before an election to publicly communicate about candidates, ballot measures, or recalls of public officials is core political speech—not an abuse.   Speaking anonymously is a principle that contributes to liberty—not an abuse.   *See Mixton*, 250 Ariz. at 298 ¶ 69 (stating "we embrace the principle of anonymous speech and recognize its inestimable contribution to our liberty"); *see also McIntyre*, 514 U.S. at 357 ("[A]nonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent.   Anonymity is a shield from the tyranny of the majority.").   The notion that a citizen—who anonymously donates a total of $5,001 over two years to an organization that later uses the donation to speak through media on a matter of public interest—is a "major donor" who represents a threat to our citizenry is contrary to the text and history of the Arizona Constitution.

### 3.   <u>Plaintiffs' Speak Freely Clause Facial Challenge</u>

**¶170**          "[I]n a typical facial challenge, we require the challenger to demonstrate that under no set of circumstances can the law be enforced in a constitutional manner."   *AZ Petition Partners*, 255 Ariz. at 258 ¶ 17.   But in the context of free speech, that requirement is relaxed "because the law's mere existence, and the penalties for violating it, can exert a 'chilling' effect on the exercise of" free speech rights.   *Id.* ¶ 18.   Indeed, the overbreadth doctrine provides an "exception" to normal facial challenge rules because "the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech."   *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003).

**¶171**          Thus, a plaintiff asserting a Speak Freely Clause facial challenge need only show that a "substantial number of [the law's] applications are unconstitutional."   *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021); *AZ Petition Partners*, 255 Ariz. at 259 ¶ 18.   We agree with the majority on this point.   *Supra* ¶¶ 19–20.   For the reasons below, Plaintiffs have sufficiently alleged that a substantial number of the Act's applications are unconstitutional because many of the Act's provisions fail

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

to regulate "with great precision and an even hand." *AZ Petition Partners*, 255 Ariz. at 257 ¶ 12.

### a. Prior Restraint On Speech

¶172    "The language of [the Speak Freely Clause] makes plain its purpose to prevent previous restraints upon publication." *Phx. Newspapers*, 101 Ariz. at 259 (quoting *Ex Parte McCormick*, 88 S.W.2d 104, 106 (Tex. Crim. App. 1935)).   The Speak Freely Clause is structured in an anti-prior restraint way—establishing a categorical right of all persons to "freely speak."   Even the majority recognizes the Clause was "understood as forbidding prior restraints on expression—such as gag orders, publication licenses, or advance censorship" and it "tolerates no censorship or restraint—major or minor—on the right to speak, write, or publish on any subject." *Supra* ¶¶ 34, 47.

¶173    In *Phoenix Newspapers*, this Court held the trial court improperly issued a "gag" order prohibiting reporters from publishing an account of an open court pretrial hearing.   101 Ariz. at 258–59.   Although the order only delayed publication until after jury selection, this Court viewed the matter as one of censorship: "The restraint imposed by the trial court in this case strikes at the very foundation of freedom of the press by subjecting it to censorship by the judiciary." *Id.*   In other prior restraint cases, this Court has similarly highlighted the conflict between free speech and government censorship. *See Mountain States*, 160 Ariz. at 357; *Phx. Newspapers Inc. v. Jennings*, 107 Ariz. 557, 559–60 (1971); *Truax*, 19 Ariz. at 393–94.

¶174    But the Act's opt-out system restrains and censors core political speech.   When a covered person decides to engage in public communication about a candidate, ballot measure, or recall of a public officer in the window of time leading up to an election (when circumstances and events are changing quickly), the covered person may not proceed with such core political speech. *See* § 16-971(2).   Instead, the covered person must provide opt-out notices and then wait three weeks for responses from donors before engaging in that core political speech. *See* § 16-972(B), (C). The opt-out timeline operates as a prior restraint that prevents core political

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

speech for three weeks at a critical time before an election.[9]  *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.").

**¶175**        The First Amendment and Speak Freely Clause afford the "broadest protection" to political expression to assure the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people."  *McIntyre*, 514 U.S. at 346 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).  Yet the Act effectively restrains and censors political expression that promotes, supports, attacks, or opposes a candidate, ballot measure, or public officer recall campaign.  *See* § 16-971(2) (defining "campaign media spending").

**¶176**        The debate over free speech issues like the one before us began before the ratification of the U.S. Constitution.  In Federalist No. 10, James Madison discussed the formation of factions in our country.  He observed that one method for removing the causes of faction is "by destroying the liberty which is essential to its existence," but this remedy "is worse than the disease."  The Federalist No. 10, at 130 (James Madison) (Benjamin F. Wright ed., 1961).  As Madison explained, "liberty . . . is essential to political life."  *Id.*  That understanding permeates our Declaration of Rights and particularly the Speak Freely Clause.  By restraining speech, the government prevents peoples' viewpoints from reaching the public domain and advising on the truth or falsity of messages and candidates who are favorable or adverse to their interests.  Yet the Act appears to do just that—serving as a prior restraint on speech in all cases and altogether prohibiting speech in some cases.

**¶177**        According to the majority, covered persons can address this issue by providing opt-out notices and obtaining donor permission "earlier, such as at the time of the donation."  *Supra* ¶ 96.  But this ignores the

---

[9]  A civil action by the Commission or any voter could further delay core political speech.  *See* A.R.S. §§ 16-974, -977 (permitting the Commission or "[a]ny qualified voter in this state" to bring a civil action that seeks legal and equitable relief).

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

realities of election season, when circumstances are rapidly changing by virtue of polling, breaking news, or other factors; therefore, people often decide to address something particular about a candidate or ballot measure mere weeks or days before election day. Yet when a covered person decides to use donations to engage in campaign media spending three weeks (or less) before election day, the Act will *altogether prohibit* that core political speech due to insufficient time to provide and receive opt-out notice responses.

**¶178** The majority claims Plaintiffs have not sufficiently alleged the Act's opt-out timeline will prevent them and others from speaking in the time preceding an election. *Supra* ¶ 95. But the law does so on its face. The majority's specificity requirement conflicts with Arizona's notice pleading standard. Plaintiffs' complaint alleges they and other covered persons are unable to use donations during the opt-out waiting period. Plaintiffs have placed Defendants on notice that their ability to speak is at most suppressed, or at least restrained, during the opt-out period—either way raising free speech concerns. Plaintiffs have sufficiently alleged and preserved this issue. *See Cullen*, 218 Ariz. at 419 ¶ 6.

**¶179** The majority also claims Plaintiffs have not plausibly alleged a substantial number of incidents of prior restraint and censorship by virtue of the opt-out waiting period. *Supra* ¶ 95. This criticism is without merit. First, incidents of prior restraint and censorship due to the opt-out waiting period must not be viewed in isolation; they must be considered along with *all* other alleged unconstitutional applications under the Act, which are discussed below. Second, our colleagues unjustly criticize Plaintiffs for not alleging more, yet they simultaneously curtail their ability to take discovery and present evidence.

**¶180** To be clear, the Act is wholly unlike other longstanding common disclosure laws. We are unaware of any other Arizona disclosure law that suppresses speech for three weeks during election season and can even altogether prohibit speech in that critical period. And in the midst of extremely tight election timelines, those three weeks may make an enormous difference. A non-profit organization with resources to effectively communicate their message in advance of an election is prohibited from using those resources to do so for three weeks. The

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

majority fails to thoroughly account for this three-week suspension of speech. As we see it, this alone warrants reversal of the trial court's Rule 12(b)(6) dismissal of Plaintiffs' facial challenge. But this is only the tip of the iceberg of the Act's constitutional infirmities.

### b. Compelled Speech And Compelled Association

¶181 Freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). The fundamental principle underlying compelled speech cases "is that an individual has autonomy over his or her speech and thus may not be forced to speak a message he or she does not wish to say." *Brush & Nib Studio*, 247 Ariz. at 283 ¶ 52 (describing compelled speech cases where the government improperly compelled a person to host or accommodate another's message). Also, the "right to eschew association for expressive purposes is likewise protected." *Janus*, 585 U.S. at 892. As the majority recognizes, compelled speech is incompatible with acting "freely," and thus our framers necessarily intended the Speak Freely Clause to protect against compelled expression and compelled association. *Supra* ¶ 34.

¶182 *NAACP v. Alabama* is instructive. 357 U.S. 449 (1958). In that case, the trial court ordered the NAACP to produce the names and addresses of its members. *Id.* at 451. The U.S. Supreme Court reversed, emphasizing "the right of the members to pursue their lawful private interests privately and to associate freely with others." *Id.* at 466. There was no "controlling justification for the deterrent effect on the free enjoyment of the right to associate which disclosure of membership lists is likely to have." *Id.*

¶183 Recently, in *First Choice Women's Resource Centers, Inc. v. Davenport*, a non-profit organization challenged an attorney general subpoena commanding the non-profit to produce identifying information about its donors. 146 S. Ct. 1114, 1119 (2026). In a unanimous opinion, the U.S. Supreme Court highlighted that in cases demanding private donor or member information, the Court has repeatedly "emphasized the critical role 'privacy in . . . associatio[n]' plays 'in preserving political and cultural

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

diversity and in shielding dissident expression from suppression.'"  *Id.*
at 1123 (alterations in original) (quoting *Bonta*, 594 U.S. at 606–07).   The
Court has "long recognized that demands for a charity's private member or
donor information have" the effect of discouraging "people from
associating with groups engaged in protected First Amendment advocacy"
and encouraging "groups and individuals to cease or modify protected
First Amendment advocacy the government disfavors."  *Id.* at 1125.   In
practice, such demands inevitably deter the exercise of free speech rights.
*See id.*

**¶184**        Here, the Act's detailed disclosure requirements associate
donors with (1) certain organizations that received their funds even
indirectly; and (2) specific messages, candidates, and ballot measures.
And the disclosure is mandated (1) without the donor ever earmarking the
contribution for that purpose; (2) without the donor ever intending the
funds to be used for any form of campaign media; and (3) no matter how
many times the funds were donated from one organization to another
before a covered person decided to purchase campaign media.

**¶185**        According to the majority, the opt-out provision is "designed
to protect donor choice."  *Supra* ¶ 5.   It is not.   As discussed, upstream
Indirect Donors may not actually receive opt-out notices.    But even if they
do, the opt-out notice simply notes use of the donor's funds "for campaign
media spending," without identifying the particular candidate, ballot
measure, or message the campaign media will support or oppose.   *See*
§ 16-972(B), (C).   The notice is mostly uninformative and fails to convey
the information necessary for a donor to make an informed decision about
whether to opt out.   Nonetheless, the donor will ultimately be tied to the
particular cause or candidate on which money is spent even if the donor
does not know that identity in advance.

**¶186**        The majority contends the opt-out system is adequate because
covered persons can provide opt-out notices at any time and a donor is then
"free to ask further questions."  *Supra* ¶¶ 5, 96.    But this argument
exposes other critical flaws in the opt-out system.   A donor who receives
an opt-out notice may inquire about the candidate, ballot measure, or
message the covered person intends to support or oppose and provide
consent to use his or her funds based on the response received.   But under

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

the Act, the donor's consent covers all forms of campaign media spending. The Act does not prevent the covered person from later using the donor's funds to support or oppose an *entirely different* candidate, ballot measure, or message to which the donor will be publicly tied.

¶187 Also, the Act's cumbersome and invasive mechanisms fail to recognize that donors may reasonably fail to respond within the twenty-one-day opt-out period—whether because the donor has moved, has no idea what the notice means, or simply has higher priorities. If that occurs, the covered person may use the donor's funds for *any* type of campaign media spending and the donor will be publicly tied to that candidate, ballot measure, or message. § 16-972(B), (C).

¶188 "Courts 'do not presume acquiescence in the loss of fundamental rights.'" *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 312 (2012) (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 682 (1999)). To that end, the U.S. Supreme Court has recognized the inefficacy of opt-out schemes in protecting First Amendment rights. *Id.* at 321 ("[B]y allowing unions to collect any fees from nonmembers and by permitting unions to use opt-out rather than opt-in schemes when annual dues are billed, our cases have substantially impinged upon the First Amendment rights of nonmembers."). As discussed, there is a significant risk that donors may not understand the need to opt out of campaign media spending under the Act, and this cloud of uncertainty fails to provide the great precision the Speak Freely Clause requires. *See AZ Petition Partners*, 255 Ariz. at 257 ¶ 12; *Rio Grande Found. v. Oliver*, 154 F.4th 1213, 1235 & n.8 (10th Cir. 2025) (Eid, J., dissenting). When fundamental rights are at stake, the constitutional baseline is opt in (not opt out) so the government can show a donor affirmatively chose to associate with a specific message.

¶189 The Act's disclosure requirements undoubtedly risk a donor's compelled speech and compelled association with candidates, ballot measures, and messages with which the donor may fundamentally disagree. And the opt-out system does not save donors from being compelled to associate with messaging they do not support. Such compelled expression is the antithesis of "free." *See Brush & Nib Studio*,

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

247 Ariz. at 305 ¶ 166 (concluding an ordinance "unconstitutionally compels speech in violation of the Arizona Constitution's free speech clause").

### c. Chilling Effect On Speech

**¶190** In the speech context, especially where severe consequences are at stake, a law must not be overbroad and it must clearly alert those subject to its provisions about how to comply. Otherwise, the law risks a serious chilling effect on constitutionally protected speech. *See Mountain States*, 160 Ariz. at 358 ("[G]iven Arizona's constitutional protections, when dealing with regulations that affect speech, the [government] must regulate with narrow specificity so as to affect as little as possible the ability of the sender and receiver to communicate."); *Hicks*, 539 U.S. at 118–19 (recognizing overbroad law may deter or chill speech); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (recognizing vague law as chilling speech). Plaintiffs have sufficiently alleged that several of the Act's provisions are vague, overbroad, and have a chilling effect on speech.

**¶191** Under the Act, the identity of a donor may be withheld when there is a reasonable probability of a serious risk of physical harm. § 16-973(F). But the Act offers no protection for those who can demonstrate a serious risk of threats, harassment, reprisals, property damage, or other forms of non-bodily harm. This is significant because the Act requires disclosure not just of individuals' names, but also their addresses, occupations, and employers.

**¶192** Notably, Arizona law recognizes the danger of distributing personal identifying information or otherwise making it available as a form of intimidation, harassment, or threatening conduct. *See* A.R.S. § 13-2916(A)(4), (E)(4) (codifying Arizona's anti-doxing statute and defining "[p]ersonal identifying information" as information that allows a person to be located, contacted, or harassed and includes a home address and employer's address). The Act's provisions run a reasonable risk of disclosed persons being subjected to threats, harassment, or retaliation (personal or professional) for mere disagreement on contentious policy matters.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

**¶193** According to the majority, many elections today "concern nonpolarizing matters." *Supra* ¶ 91. Of course, that is not where the concern about campaign spending lies. But Americans see politically motivated violence as on the rise in the United States, and many identify political polarization as the cause. *See* Joseph Copeland & Jocelyn Kiley, *Americans say politically motivated violence is increasing, and they see many reasons why*, Pew Research Center (Oct. 23, 2025), https://www.pewresearch.org/short-reads/2025/10/23/americans-say-politically-motivated-violence-is-increasing-and-they-see-many-reasons-why/. Elections and issues that were once viewed as "ordinary" have become increasingly polarized, and this applies to ballot measures and candidates at the national, state, and local levels. And the risk of political violence is not theoretical. In the last few years alone, several public officials and political figures have been the targets of horrific acts of violence. Also, in an era of "cancel culture," the ubiquity of social media enables those who would punish people with whom they disagree to quickly publish and widely disseminate personal information, including home addresses and employers, with the purpose and effect to facilitate intimidation and damage to property and livelihood. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 485 (2010) (Thomas, J., concurring in part and dissenting in part) (rejecting "a view of the First Amendment that subjects citizens of this Nation to death threats, ruined careers, damaged or defaced property, or pre-emptive and threatening warning letters as the price for engaging in" core political speech). The majority's reference to elections that "concern nonpolarizing matters," *supra* ¶ 91, is not compelling. The Speak Freely Clause, like the First Amendment, does not exist to protect non-controversial or popular speech.

**¶194** According to the majority, Plaintiffs have insufficiently connected acts of violence or intimidation with longstanding common disclosure laws. *Supra* ¶¶ 92-93. But those longstanding common disclosure laws vastly differ from the Act's provisions, which have detailed disclosure requirements for people who (1) donated to non-profits that are not controlled by, and do not coordinate with, candidates or their campaign committees; (2) donated without intending their funds to ever be used for campaign media; (3) donated without knowing their funds would eventually be transferred through several different organizations; and (4) never received an opt-out notice specifying the message to be used in

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

the campaign media (yet they will be publicly tied to that specific message). Also, the majority's argument ignores the important point that, in light of recent acts of violence, reasonable people will decide to self-censor instead of running the risk of violence or intimidation. Moreover, the dismissal of Plaintiffs' facial challenge at this early stage altogether denies them the opportunity to discover and present evidence on this issue.

¶195 Mandatory disclosure laws that fail to protect against credible risks of "threats, harassment, or reprisals from either Government officials or private parties" will undoubtedly chill future speech. *Buckley v. Valeo*, 424 U.S. 1, 74 (1976). "[I]dentification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance." *Talley*, 362 U.S. at 65. In this manner, the Act has the ability to "chill or silence a person of ordinary firmness from future [free speech] activities." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996), *vacated on other grounds by* 523 U.S. 574 (1998)); *see also Buckley*, 424 U.S. at 68 ("It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute. In some instances, disclosure may even expose contributors to harassment or retaliation. These are not insignificant burdens on individual rights.").

¶196 Next, the vagueness doctrine addresses "discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC*, 567 U.S. at 253. And "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54. We just recognized this very point in *AZ Petition Partners*. 255 Ariz. at 257 ¶ 12 ("[T]he state must regulate in this area with great precision and an even hand, alerting all to the law's requirements and proscriptions, and leaving little to nothing by way of subjectivity in enforcement.").

¶197 Here, there remain significant questions about how a covered person is supposed to undertake a search under the Act for each and every

74

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

upstream Indirect Donor whose funds eventually made their way to the organization through several other organization donations. Even after extensive briefing and oral argument, the mechanics of this process remain unclear to us. But in the event of an error in disclosing an upstream Indirect Donor—even an inadvertent one—the covered person is subject to "significant civil penalties." *See* § 16-976(A); Act, § 2(D). Statutory commands must provide fair notice to the public, and this is especially true for election-related speech provisions that impinge on free speech rights. *See Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023). The Act's complexity will keep election lawyers employed for years to come, but ordinary citizens (and even judges) will find its requirements difficult to comprehend. The Act's lack of clarity increases the risk of chilling speech by covered persons who would otherwise purchase campaign media.

**¶198** Further, given the compelled speech and compelled association issues previously discussed, Plaintiffs have sufficiently alleged the Act's mandatory disclosure requirements for Direct Donors and upstream Indirect Donors are overbroad and impose a chilling effect on speech and association rights. *See NAACP*, 357 U.S. at 466 (discussing "the deterrent effect on the free enjoyment of the right to associate which disclosure of membership lists is likely to have"); *Hicks*, 539 U.S. at 119 ("[T]he threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech.").

### 4. The Majority's Interpretation Of The Speak Freely Clause

**¶199** According to the majority, censorship or restraint on speech may be permitted "in accordance with the Constitution's directives." *Supra* ¶¶ 47–48. We agree that a conflicting constitutional provision may place limitations on free speech rights. But the majority improperly relies on wholly inapplicable constitutional provisions to justify the Act's sweeping provisions.

**¶200** Also, for the first time in Arizona history, the majority has created a broad police power justification for intrusion on free speech rights for "the state's proper exercise of its regulatory authority." *Supra*

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

¶¶ 47–48.   This ignores the Speak Freely Clause's sole textual limitation that permits intrusion on free speech for "abuse of that right."   The majority's interpretation eviscerates the strong speech protections our framers established in the Speak Freely Clause.

### a.   Other State Constitutional Provisions

**¶201**        We agree with the majority that we independently interpret Arizona's constitutional provisions and "[t]he Speak Freely Clause remains an independent source of constitutional protection."   *Supra* ¶¶ 30, 56. We also agree that when competing state constitutional provisions are at issue, we should undertake a fulsome review of all relevant constitutional provisions.   *Supra* ¶¶ 30, 33.   In that instance, we read the separate constitutional provisions to harmonize and give effect to each.   *See Knight*, 261 Ariz. at 39 ¶ 32.   Thus, if we were to read a constitutional provision to conflict with the Speak Freely Clause, we would seek to harmonize and enforce both.   But there are *no* other state constitutional provisions that conflict with the Speak Freely Clause and support the Act's detailed disclosure requirements here.[10]

**¶202**        The Act mandates the disclosure of donations to non-profits that are not controlled by, and do not coordinate with, candidates or their campaign committees.   But the Arizona Constitution does not require or authorize the disclosure of persons who donate to organizations that are not candidates or campaign committees.   Nor does the Arizona Constitution require or authorize the regulation of independent, non-abusive speech about candidates or ballot measures.   The majority relies on several constitutional provisions that do not support the Act's regulations.

---

[10]   On this point, we note the Act was proposed and passed as a statutory amendment—not as a constitutional amendment.   *See, e.g.*, Ariz. Const. art. 4, pt. 1, § 1(2) (requiring signatures by ten percent of qualified electors for a proposed statutory amendment, and signatures by fifteen percent of qualified electors for a proposed constitutional amendment).

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

¶203 Article 7, section 12 provides: "There shall be enacted registration and other laws to secure the purity of elections and guard against abuses of the elective franchise." This provision directs the Legislature to pass voter registration and other laws to secure the integrity of voting procedures and ballots where voters choose among alternatives. *See Election*, New Websterian Dictionary (1912) ("[T]he act of electing; voluntary preference; the act of choosing a person for some office or function by show of hands, or by ballot."); *Election*, Webster's International Dictionary of the English Language (1907) ("The act of choosing; choice; selection."); *Election*, Black's Law Dictionary (2d ed. 1910) ("The act of choosing or selecting one or more from a greater number of persons, things, courses, or rights. The choice of an alternative . . . . The selection of one man from among several candidates.").

¶204 The majority claims the Arizona Constitution demonstrates a commitment to "election integrity," citing article 7, section 12. *Supra* ¶¶ 53–54. But article 7, section 12 addresses procedures for voting and ballots that secure the integrity of the election itself. It does not require or authorize sweeping disclosure laws that are unconnected to the procedures for conducting an election, and nothing in its text demonstrates an intent to eviscerate the protections of the Speak Freely Clause. Also, as discussed, donating to an organization with which one agrees, even anonymously, is not an "abuse of the elective franchise."

¶205 The majority also relies on article 7, section 16, which provides: "The [L]egislature, at its first session, shall enact a law providing for a general publicity, before and after election, of all campaign contributions to, and expenditures of campaign committees and candidates for public office." Note that this "General Publicity Clause" is simply a command to the Legislature to enact a law "at its first session" regarding disclosures for campaign contributions *to* candidates and *to* campaign committees, where anti-corruption and informational interests are significant given the quid pro quo risk of a person or entity donating to a candidate or the candidate's campaign committee with the expectation of receiving something in return upon election. *See McIntyre*, 514 U.S. at 356. But the Act does not regulate contributions *to* candidates or *to* campaign committees (the Act instead regulates speech *about* candidates). And as the majority notes, there are already laws in place requiring disclosures in

77

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

the context of contributions to candidates and campaign committees. *Supra* ¶ 3 n.1 (citing multiple statutes).

¶206 Also, the General Publicity Clause does not explicitly reference initiatives or referenda, yet the Act requires disclosures for campaign media spending on "any state or local initiative or referendum." § 16-971(2)(a)(iv).

¶207 The majority broadly claims the Arizona Constitution demonstrates a commitment to "transparency," citing the General Publicity Clause. *Supra* ¶¶ 68–69. But the Constitution's mandate of transparency was expressly limited. The General Publicity Clause does *not* require or authorize publicity about Arizonans' donations to non-profit organizations that are not controlled by, and do not coordinate with, candidates or campaign committees.

¶208 We also cannot ignore the fact that the framers rejected Proposition 70, which would have required the Legislature to "provid[e] for a general publicity . . . of all contributions of money . . . *for the purpose of influencing any . . . election*." *See The Records of the Arizona Constitutional Convention of 1910*, at 64, 1179–80, 1385 (John S. Goff ed., 1991) (emphasis added). The broad constitutional meaning the majority attempts to invoke was *expressly rejected* by the framers, which undermines the expansive interpretation the majority places on the General Publicity Clause.

¶209 Relatedly, the territorial disclosure law, upon which the majority relies in its discussion of transparency, *only* applied to "committees of each and every political party presenting candidates" (and such disclosures were required "thirty days after each election"). Rev. Stat. Ariz. Territory, Penal Code, pt. 1, tit. IV, § 66 (1901). And the Legislature's enactment of a disclosure law shortly after statehood *only* required disclosures from candidates and campaign committees. *See* 1912 Ariz. Sess. Laws ch. 69, §§ 6–7 (1st Spec. Sess.). While other states may have had statutes similar to Arizona's around 1912, the majority fails to point to any other state statute with the more extensive disclosure provisions found in the Act.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

**¶210**      The majority's broad discussion of transparency in elections improperly conflates donations to candidates and campaign committees with donations to independent non-profit organizations.  *See, e.g.*, *supra* ¶¶ 63, 69, 74 (referring to "campaign-related contributions," "donations in the election context," and "election-related contributions").    This is contrary to Arizona's constitutional text and history at the time of statehood.

**¶211**      The majority also claims that "[b]ecause the General Publicity Clause does not prohibit broader disclosure laws, the People were free to enact the Act."   *Supra* ¶ 66.   But this misses the mark.   First, the Act's required disclosures are not a logical, natural, or historically defensible extension of the General Publicity Clause's disclosures.    Indeed, the framers expressly rejected Proposition 70, thus declining to embrace the types of disclosures the Act requires.   Although the majority emphasizes that the record is silent on the framers' reason for rejecting Proposition 70, their rejection hardly bolsters the majority's claim that the framers intended the General Publicity Clause to justify precisely what they eschewed.  Second, while the General Publicity Clause does not prohibit future legislative enactments that include other disclosure provisions, it is not carte blanche authority to pass any law.   Because the Arizona Constitution "limits the exercise and scope of legislative authority," any such enactments not expressly contemplated within the General Publicity Clause (like the Act) may not unconstitutionally infringe on Arizonans' rights under the Speak Freely Clause.   *See Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 5 ¶ 13 (2013).   The General Publicity Clause is best viewed as a narrow exception to the Speak Freely Clause.

**¶212**      The majority also relies on article 14, section 18, which prohibits any corporation from "mak[ing] any contribution of money or anything of value for the purpose of influencing any election or official action."    The majority reasons that the framers, therefore, "did not understand or intend corporate campaign contributions to be protected expression under the Speak Freely Clause."   *Supra* ¶ 29.   But the Act does not regulate corporate contributions to campaigns.   It instead regulates individuals' and organizations' speech about candidates and ballot measures.    Article 14, section 18's specific prohibition on corporate contributions is not evidence of a general understanding that other types of

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

spending about election-related issues are entirely removed from the Speak Freely Clause's broad protection. We also note that Plaintiffs do not challenge the public disclosure of the non-profit organizations that purchase campaign media. In sum, article 14, section 18, which as the majority notes likely violates the First Amendment, is inapplicable here. *Supra* ¶ 29 n.3.

**¶213** Further, the majority broadly pronounces that other constitutional provisions embrace concerns about "powerful economic interests" that support the Act's disclosures. *Supra* ¶ 68. But the majority relies on various constitutional provisions that do not address "powerful economic interests." *Supra* ¶ 68 (citing Ariz. Const. art. 2, § 21; *id.* art. 4, pt. 1, § 1; *id.* art. 7, §§ 1, 10; *id.* art. 8, pt. 1, §§ 1-6). Even more, the majority does not explain how the collective interests of individual Arizonans, each of whom independently donates a total of $5,001 during a two-year election cycle, constitute "powerful economic interests."

**¶214** The majority also relies on other entirely irrelevant constitutional provisions. *Supra* ¶ 46 (citing Ariz. Const. art. 14, § 16 ("The records, books, and files of all public service corporations, state banks, building and loan associations, trust, insurance, and guaranty companies shall be at all times liable and subject to the full visitorial and inquisitorial powers of the state . . . ."); *id.* art. 2, § 19 (compelling testimony from any person with knowledge "of facts that tend to establish the guilt of any other person or corporation charged with bribery or illegal rebating"); *id.* art. 11, § 1 (requiring the Legislature to establish and maintain "a general and uniform public school system")). These provisions fail to support a broad intrusion on free speech rights that is contrary to the plain text of the Speak Freely Clause. The Act does not regulate (1) business records of public service corporations, state banks, building and loan associations, or trust, insurance, and guaranty companies; (2) testimony in a matter where a person or corporation has been charged with bribery or illegal rebating; or (3) the public school system.

**¶215** Failing to identify any specific provision of the Constitution that curbs the expansive protection of the Speak Freely Clause, the majority relies on general principles it contends derive from various constitutional

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

provisions.     But that constitutional text fails to support the Act's provisions.   *See Torres v. Madrid*, 592 U.S. 306, 324 (2021) (embracing the interpretative approach that courts focus on the text of the constitution, "not some penumbral emanation").   We have not adopted the penumbral emanation approach to constitutional interpretation in Arizona.

¶216        But even if another constitutional provision implies an overarching general principle, such as transparency, that general principle does not apply when, as here, the issue is directly covered by the specific text of the Speak Freely Clause.   Purported constitutional themes do not trump express commands.   *See Knight*, 261 Ariz. at 35–36 ¶ 17 ("[W]here the [C]onstitution specifically addresses the particular subject at issue, we must address that specific provision first . . . . We need not resort to the less specific provision unless the argument based upon the more specific fails." (alterations in original) (quoting *Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 179 Ariz. 233, 238 (1994))); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 184 (2012) ("[T]he general/specific canon does not mean that the existence of a contradictory specific provision voids the general provision.   Only its application to cases covered by the specific provision is suspended; it continues to govern all other cases.").

¶217        The majority contends that the constitutional provisions previously discussed "demonstrate a constitutional intent to direct the exercise of the police power to ensure transparent and corruption-resistant elections and reasonably encompass legislation requiring disclosure of contributors to groups that expend significant resources to independently support or oppose candidates or ballot measures."   *Supra* ¶ 65.   This broad pronouncement strikes at the heart of our constitutional disagreement.   The majority views these provisions as a carte blanche delegation of authority to which the Speak Freely Clause provides only a modest constraint.   In contrast, we view the other constitutional provisions by their terms as a specific, limited exception to the default rule of the Speak Freely Clause.

¶218        The limitation in the Speak Freely Clause is not a license for the government to compel or censor, but rather to hold a person responsible

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

for abusing the right. Restraints on political speech and contributions are permissible only if they constitute an abuse of the right (bribery, for example), or if they are precisely mandated or authorized elsewhere in the Arizona Constitution, and then, only to the extent of such mandate or authority. The default rule in all other circumstances remains the right to speak freely.

**¶219** The majority has taken the position, for the first time in this Court's history, that the Speak Freely Clause may be less protective than the First Amendment. *Supra* ¶¶ 29–31. This view reverses an unbroken line of cases holding that the Speak Freely Clause provides broader protection than the First Amendment. *See Mountain States*, 160 Ariz. at 354–55; *Brush & Nib Studio*, 247 Ariz. at 282 ¶ 46; *Coleman*, 230 Ariz. at 361 ¶ 36 n.5; *Stummer*, 219 Ariz. at 142 ¶ 15. The majority's attempt to curtail the sweeping scope of the Speak Freely Clause to conform with inapplicable constitutional provisions largely eviscerates Arizonans' free speech rights.

### b. The Government's Legitimate Exercise Of Its General Regulatory Authority

**¶220** The majority contends Arizonans at statehood understood that expression was not insulated from "the government's legitimate exercise of its general regulatory powers," and that the government's general police powers support the Act's regulations. *Supra* ¶ 36.

**¶221** The majority relies on the government's implementation of time, place, and manner regulations at statehood to support its police power justification for infringement on free speech rights and permit the Act's detailed disclosure requirements. But this reasoning is flawed for several reasons. First, the Clause's sole textual limitation—"abuse of that right"—already accounts for the law of nuisance in existence at the time of ratification of the Arizona Constitution. *See Ariz. Copper Co. v. Gillespie*, 12 Ariz. 190, 202 (1909) ("But when the alleged nuisance would constitute a private wrong by injuring property or health, or creating personal inconvenience or annoyance, for which an action might be maintained in favor of a person injured, it is none the less actionable because the wrong is committed in a manner and under circumstances which would render the

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

guilty party liable to indictment for a common nuisance."). The majority has unnecessarily created a sweeping police power authorization for eviscerating free speech protections under the Speak Freely Clause that vastly exceeds the time, place, and manner regulations recognized at statehood.

¶222          Second, the majority fails to cite any Arizona case that permits sweeping disclosure requirements under the guise of a time, place, and manner regulation.

¶223          Third, reasonable time, place, and manner regulations, by definition, apply to all speech, without regard to content. *See Mountain States*, 160 Ariz. at 357–58 (permitting "content-neutral, reasonable time, place, and manner regulations that tangentially affect speech"). By contrast, the Act is entirely content-based—whether its regulations apply depends entirely on the content of the speech.

¶224          Fourth, reasonable time, place, and manner regulations do not censor speech. *Id.* But the Act operates as a prior restraint on core political speech in all cases where a covered person decides to publicly communicate through campaign media leading up to an election, and it altogether prohibits such speech in certain instances.

¶225          Reasonable time, place, and manner regulations merely operate to prevent "abuse" in the exercise of speech rights, such as violations of traffic obstruction laws or noise ordinances. We do not dispute the government's authority to impose reasonable, content-neutral time, place, and manner regulations. Indeed, this Court has already set forth a standard for evaluating whether a time, place, and manner regulation is reasonable and constitutionally permissible. *Id.* (requiring the state to show that the time, place, and manner regulation is content-neutral, serves a significant governmental interest, and is drawn with narrow specificity to minimize interference with the ability of speakers to communicate with others). But the Act and the types of reasonable time, place, and manner regulations in effect at statehood occupy polar ends of the analytical spectrum. *See Coleman*, 230 Ariz. at 360–61 ¶ 33.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

¶226        The majority also relies upon a variety of territorial and statehood-era measures to determine at this early stage that the Act is facially constitutional.   But no measure at the time of statehood authorized (1) total effective censorship of speech for weeks in the critical time leading up to an election; (2) disclosure requirements for contributions to organizations that are not candidates, campaign committees, or political party committees presenting candidates; (3) disclosures of people who did not themselves take action to cause a public message to be made or published about an initiative or referendum; or (4) disclosures of upstream Indirect Donors regardless of how many times the funds were transferred or whether the upstream Indirect Donor ever intended the funds to be used for campaign media.

¶227        The majority points to a criminal libel provision punishing "malicious defamation," *supra* ¶ 37, but criminal libel is a classic "abuse of that right" already prohibited under the Speak Freely Clause.   Measures prohibiting misleading or false labeling of food and beverages, akin to fraud on consumers, also address "abuses."   *See Lycett*, 133 Ariz. at 191; *supra* ¶ 39.   And other criminal laws, such as those pertaining to obscenity or promotion of acts that were unlawful at that time, may have been construed as an "abuse" of the right to speak freely in 1911.   *Supra* ¶ 37.

¶228        The majority also points to territorial and statehood-era examples where (1) certain cities (Tucson and Phoenix) required occupational licensing and authorized their councils to regulate or prohibit places like dance halls, exhibitions, and public shows; and (2) general police powers enabled the government to compel factual, nonideological disclosures necessary to protect public health, safety, and welfare (such as mandatory reporting about contagious diseases, marriages, births, and deaths; displaying signs about the law; and requiring display of a license and labeling of poisons).   *Supra* ¶¶ 38, 40-41.   First, a local government's territorial and statehood-era actions do not necessarily imbue them with constitutional legitimacy.   Second, the majority fails to provide any evidence indicating the framers considered (or even knew about) these particular Tucson and Phoenix ordinances when drafting the Arizona Constitution.   Third, the Act's disclosures are neither "factual" nor "nonideological."   Again, none of these types of measures are before us, and thus the majority's reliance on them is not compelling.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

**¶229** The majority also relies on a 1917 law passed by the Legislature that prohibited anonymous communications regarding initiatives and referenda. *Supra* ¶ 71; 1917 Ariz. Sess. Laws ch. 47, § 1 (Reg. Sess.). Specifically, the 1917 law required persons or organizations to disclose their identities if they made, published, circulated, or placed (or directly or indirectly caused to be made, published, circulated, or placed) before the public any advertisement, argument, or statement in favor of or against any initiated or referred measure or amendment to the Arizona Constitution. 1917 Ariz. Sess. Laws ch. 47, § 1 (Reg. Sess.). Violations were subject to imprisonment of up to two years and a fine of up to $500. *Id.* The 1917 law, however, did not mandate the disclosure of donors who took no action to cause a public message to be made or published about an initiative or referendum. We therefore disagree with the majority's attempt to analogize the 1917 law to the Act's provisions that are being challenged here.[11]

**¶230** Moreover, the majority fails to identify a single instance of the 1917 law being enforced, and in fact, the 1917 law was later repealed. *Supra* ¶ 71 n.6. This is unsurprising given its significant constitutional infirmities. Indeed, the U.S. Supreme Court later invalidated a law restricting the distribution of anonymous handbills, explaining: "There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression . . . . Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind." *Talley*, 362 U.S. at 60–61, 63–65. The 1917 law restricted freedom of expression by broadly prohibiting anonymous communications about initiatives and referenda, was later repealed, and there is no evidence of its enforcement. This legislative enactment does not demonstrate that Arizonans at statehood deemed the sweeping disclosure requirements found in the Act to be consistent with the Speak Freely Clause, and it does not justify the wholesale evisceration of anonymous speech embodied in the Act's disclosure requirements.

---

[11]   Again, Plaintiffs are not challenging disclosure requirements for covered persons who purchase the campaign media.

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

¶231         The majority claims that the statehood-era disclosure requirements "embodied a single animating principle: that the public has a right to know who is financing efforts to influence their votes."   *Supra* ¶ 73. But there was not an "animating principle" at statehood about disclosing people who (1) simply donated to organizations whose values they shared; and (2) were not individually undertaking their own efforts to influence votes.     The majority's statehood-era measures fail to support an understanding that the Act's sweeping disclosure requirements were constitutionally permissible.

¶232         Further, the majority cites several cases addressing the government's police power authority, *supra* ¶ 36, but none of those cases are in the context of the Speak Freely Clause and thus are not persuasive.

¶233         We also disagree with the majority that the term "freely" somehow incorporates conditions that include the legitimate exercise of the state's police power.   *See supra* ¶ 45.   The text of the Speak Freely Clause contains no such incorporation or conditions.

¶234         Certainly, the public meaning of the Arizona Constitution at statehood permitted the implementation of particular measures in the exercise of the Legislature's police powers as necessary for public health, safety, and welfare—and that remains so today.   But there is no support for the proposition that the exercise of permissible police powers at statehood extended to the types of provisions in the Act that are before us. Indeed, the framers' rejection of Proposition 70 proves the opposite.

¶235         The majority's opinion sets forth a new Arizona-specific framework for compelled electoral disclosure laws, like the Act: "[O]nce a challenger shows that protected expression is at stake, the state (or a private party defending the law) must show that the disclosure requirement (1) meaningfully furthers election integrity or transparency; and (2) does not unreasonably burden or hinder protected expression."   *Supra* ¶ 54. This Arizona-specific framework is distinct from the several tests applied by the U.S. Supreme Court in the First Amendment context.   We agree with the majority that we should not adopt the tiers of scrutiny applicable in First Amendment jurisprudence, *supra* ¶ 26, but we contend that Arizona

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

does not need a new free speech test for the Speak Freely Clause because we already have one. The Speak Freely Clause contains its own limitation—"being responsible for the abuse of that right." It is straightforward and does not lend itself to outcome manipulation. Courts merely determine whether words or actions were an "abuse" of the right to speak freely when the Arizona Constitution was adopted. Defamation was an abuse of the right at that time. So was fraud. So was bribery. So was conspiracy. So was nuisance. But anonymous speech about political issues was *not* an abuse of the right, a point the majority does not dispute.

**¶236** Although the majority's standard is indeed Arizona-specific, it is neither moored to the Speak Freely Clause nor our jurisprudence interpreting the Clause. Nor is it an improvement to the federal standard applied in this circumstance. In fact, this standard appears less protective than the exacting scrutiny standard the U.S. Supreme Court uses to review compelled disclosure laws under the First Amendment. *See Citizens United*, 558 U.S. at 366–67 (explaining that disclosure requirements are subjected "to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest" (quoting *Buckley*, 424 U.S. at 64, 66)).

**¶237** The majority's framework, which is based on inapplicable constitutional provisions and a nebulous and sweeping "legitimate exercise of [the government's] general regulatory powers, including its police power," *supra* ¶ 36, is inconsistent with our repeated declaration that the Speak Freely Clause has greater scope than the First Amendment. *See Mountain States*, 160 Ariz. at 354–55; *Brush & Nib Studio*, 247 Ariz. at 282 ¶ 46.

**¶238** "[S]tate courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." *Arizona v. Evans*, 514 U.S. 1, 8 (1995). When examining the Speak Freely Clause in a context where there is *no* other applicable state constitutional directive, as here, we certainly should not apply a lower level of protection than the First Amendment provides. But the majority has done just that. Our analysis embraces this Court's independent interpretation of Arizona's robust free speech rights. Indeed, "Arizona courts have relied on [the Speak Freely

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

Clause] to define and protect the rights of Arizonans when the First Amendment falls short." Rebecca White Berch et al., *Celebrating the Centennial: A Century of Arizona Supreme Court Constitutional Interpretation*, 44 Ariz. St. L.J. 461, 471 (2012).

**¶239** The nebulous and sweeping police power justification for intrusions on speech nullifies the sole textual limitation in the Speak Freely Clause for "abuse of that right" and swallows the rule by authorizing government restraint on and suppression of non-abusive speech.

### c.   A Rule 12(b)(6) Dismissal Is Improper

**¶240** The majority claims "Defendants have shown as a matter of law that…the Act's disclosure requirements meaningfully further election integrity and transparency." *Supra* ¶ 78. We are not persuaded this early-stage dismissal of the lawsuit is tenable, either under the exacting scrutiny standard or the majority's framework. Plaintiffs' complaint should not have been dismissed under Rule 12(b)(6).

**¶241** The Act contains a "purpose and intent" section, which identifies its intent "to prevent corruption" and provide more information so voters can "mak[e] informed election decisions." *See* Act, § 2 (A)–(C). But Plaintiffs have sufficiently alleged that the Act's provisions do not meaningfully further those purposes, and even if they did, the state must regulate in the area of free speech "with great precision and an even hand." *AZ Petition Partners*, 255 Ariz. at 257 ¶ 12.

**¶242** The Act's lack of an earmarking requirement—that is, covering only those persons who designate their funds for a specific political purpose—both amplifies the compelled speech defect and dilutes the government's informational and anti-corruption interests. In *Wyoming Gun Owners*, the court discussed the role earmarking can play in sufficiently tailoring a donor disclosure law, noting the Wyoming donor disclosure law did not contain an earmarking system. 83 F.4th at 1248 (citing *Indep. Inst. v. Williams*, 812 F.3d 787, 797 (10th Cir. 2016) (reasoning that a Colorado law's requirement that organizations "need only disclose those donors who have specifically earmarked their contributions for electioneering purposes" helped render the statute's scope "sufficiently

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

tailored")).   As the *Wyoming Gun Owners* court explained, "[i]nstituting an earmarking system better serves the state's informational interest; it directly links speaker to content, whereas the Secretary's solution dilutes the statutory mission.   The Secretary does not explain why this solution is beyond Wyoming's reach."   *Id.*   The absence of such a mechanism in the Act demonstrates a lack of narrow tailoring.

**¶243**         Moreover, what is the government's interest in disclosing the Detailed Personal Information of a person who donated to a non-profit without any intent for his or her funds to be used for any form of campaign media spending, much less for the particular candidate or ballot measure that ultimately appeared in campaign media?   With a lack of earmarking and the nature of fund transfers, what is the connection to tie donors (particularly upstream Indirect Donors) to any candidate, ballot measure, or message?   Without a sufficient link between the speaker and content, any government informational or anti-corruption interest is significantly diminished or altogether eliminated.   It can also give rise to inherently misleading messages about "who is speaking about a candidate [or ballot measure] shortly before an election."   *See Citizens United*, 558 U.S. at 369.

**¶244**         Further, the Act renders the Commission the custodian of lists of civically engaged citizens who have donated any amount over $2,500 during a two-year election cycle, making those lists ripe for release and weaponization by political opponents.   What is the government's informational and anti-corruption interest in a $2,501 donor (over the course of two years) being publicly disclosed, particularly an upstream Indirect Donor who never earmarked the funds for the particular candidate or ballot measure that ultimately appeared in campaign media?   How does this provision prevent corruption?   The majority does not answer these questions but instead dismisses these issues as "speculative" and claims the public records issue is not alleged to arise in a substantial number of cases.   But we do not look at each constitutional infirmity in isolation; we must look at whether the Act's collective constitutional infirmities arise in a substantial number of applications or create a chilling effect on protected speech.

**¶245**         In addition, the Act requires disclosure for campaign media spending for initiatives and referenda.   § 16-971(2)(a)(iv).   But, unlike

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

with candidates, the government's anti-corruption interests for initiatives and referenda are non-existent. "In candidate elections, the Government can identify a compelling state interest in avoiding the corruption that might result from campaign expenditures. Disclosure of expenditures lessens the risk that individuals will spend money to support a candidate as a quid pro quo for special treatment after the candidate is in office." *McIntyre*, 514 U.S. at 356. But with referenda and other issue-based ballot measures, the question is different because the "interest in avoiding the appearance of corruption . . . has no application." *Id.* at 354, 356.

**¶246** Plaintiffs have sufficiently alleged at this early stage that the Act's requirements for covered persons to disclose information about third parties (not a person merely disclosing their own information) do not meaningfully further the government's interests. But with the dismissal of their case under Rule 12(b)(6), Plaintiffs were improperly denied the opportunity to obtain information from Defendants and third-parties related to whether the Act's disclosure requirements meaningfully further anti-corruption and informational interests. They were also denied the ability to inquire about less restrictive alternatives, such as (1) a law allowing disclosure of persons who earmark their funds for campaign media in support of a particular candidate, ballot measure, or message; or (2) specific recordkeeping requirements that would assist investigations into violations of state or federal law, such as criminal investigations into bribery of public officials. *See, e.g.*, A.R.S. § 13-2602 (making bribery of a public official, including a person who has not yet assumed office, a class 4 felony).

**¶247** In sum, Plaintiffs have plausibly alleged the Act violates the Speak Freely Clause in a substantial number of applications. Plaintiffs have satisfied the notice pleading standard and their claim for facial invalidity should not have been dismissed under Rule 12(b)(6). Plaintiffs should not be faulted for not alleging more—effectively proving their case—at this early stage. But the majority does just that.

### 5. <u>As-Applied Challenge Under The Speak Freely Clause</u>

**¶248** Plaintiffs argue the Act is unconstitutional as applied to them under the Speak Freely Clause. An as-applied challenge assumes a law is

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

generally constitutionally valid and enforceable, but to prevail, Plaintiffs must show the law has been or is likely to be unconstitutionally applied to them. *See Smith v. Fontes*, 260 Ariz. 201, 206–07 ¶ 26 (2025); *McCullen v. Coakley*, 573 U.S. 464, 486 n.4 (2014).

**¶249** We have interpreted and applied the Speak Freely Clause in a manner that differs from the majority. Nonetheless, for all the reasons outlined above, we agree Plaintiffs have sufficiently alleged that the Act, as applied to them, violates the Speak Freely Clause. Accordingly, we agree with the reversal of the trial court's Rule 12(b)(6) dismissal of Plaintiffs' as-applied Speak Freely Clause claim.

## D. The Private Affairs Clause

### 1. Facial Challenge Under The Private Affairs Clause

**¶250** "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Ariz. Const. art. 2, § 8. Plaintiffs allege the Act is facially unconstitutional because it compels the disclosure of information related to persons' confidential charitable donations.

**¶251** The Arizona Constitution does not define the term "private affairs." In *Mixton*, this Court reviewed dictionaries at the time of statehood to determine the ordinary meaning of "private affairs" at the time of adoption. 250 Ariz. at 290–91 ¶ 33. Those dictionaries defined "private" as "affecting or belonging to private individuals, as distinct from the public generally," or as "peculiar to one's self; personal; alone; secret; not public; secluded; unofficial." *Id.* (quoting Black's Law Dictionary (2d ed. 1910) and New Websterian Dictionary (1912)). And the term "affairs" was understood to mean "a person's concerns in trade or property; business." *Id.* at 291 ¶ 33 (quoting Black's Law Dictionary (2d ed. 1910)).

**¶252** Notably, when interpreting the meaning of the Private Affairs Clause in *Mixton*, this Court expressly recognized the value of anonymous speech in preserving our liberty. *Id.* at 298 ¶¶ 68–69 (explaining "we embrace the principle of anonymous speech and recognize its inestimable

91

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

contribution to our liberty"); *see also Mobilisa*, 217 Ariz. at 109 (recognizing the constitutional right to speak anonymously). Relatedly, the U.S. Supreme Court has "recognized the vital relationship between freedom to associate and privacy in one's associations." *NAACP*, 357 U.S. at 462.

**¶253**      Plaintiffs have sufficiently alleged at this early stage that a person's donation to a non-profit organization with whom that person agrees and supports is the type of activity that falls within the public meaning of "private affairs" in 1911, as a personal matter that reflects one's financial priorities and individual values. *See Mixton*, 250 Ariz. at 290 ¶ 33; *id.* ¶ 34 (addressing delegates' discussion of "records, books and files" in the context of the Private Affairs Clause); *id.* ¶ 35 (discussing contemporaneous editorial comments made to the *Arizona Republican* about the "dangers of sweeping *legislative* investigations involving unfettered state access to a corporation's business records for political or nefarious purposes"). Although a separate organization receives the person's donated funds, we cannot overlook the fact that people routinely donate in a private manner. People often wish to preserve the confidentiality of their donations for reasons rooted in privacy—e.g., personal humility, religious values, desire to avoid public attention, protection from other solicitations, or avoiding personal or professional reprisals.

**¶254**      In *Mixton*, the Court concluded the defendant voluntarily shared his IP address and subscriber information with third-party service providers who own and routinely use such information. *Id.* at 295 ¶ 51. The IP address and subscriber information were not "private affairs" because the defendant "did not plausibly endeavor to elude identification" and did not maintain a reasonable expectation of privacy. *Id.* at 293–94 ¶ 44, 298 ¶¶ 68–69. But here, we are merely at the 12(b)(6) stage and there is no evidence that donors have affirmatively and voluntarily waived their privacy rights or failed to take efforts to maintain a reasonable expectation of privacy. And as discussed, Plaintiffs have raised legitimate concerns that the opt-out system fails to ensure donors can make an informed decision about voluntarily waiving their privacy protections.

**¶255**      Accordingly, for purposes of this Rule 12(b)(6) motion to dismiss, we decline to conclude in a sweeping manner that people lack a

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

reasonable expectation of privacy in their donations to charitable organizations. *See id.* at 292–93 ¶ 41 (discussing whether "society is prepared to accept such an expectation of privacy as reasonable"); *see also NAACP*, 357 U.S. at 466 (recognizing "the right of the members to pursue their lawful private interests privately and to associate freely with others").

¶256 The majority argues that "[e]lections are matters of profound public concern" and efforts to influence them have long been considered public acts. *Supra* ¶ 110. But the Act sweeps up both Direct Donors and upstream Indirect Donors who simply donated to a non-profit of their choice without ever designating their funds to be used in any type of campaign media, much less for a specific candidate or ballot measure. Indeed, the majority does not dispute, nor could they, that many upstream Indirect Donors never intended their donations to be used for campaign media. All of this undermines the claim that people swept up by the Act's disclosure requirements are the type of people seeking to influence an election.

¶257 The text of the Private Affairs Clause provides only one limitation. A person's private affairs may be disturbed where there is "authority of law." But Defendants have not identified any "lawful authority," such as a search warrant or other compulsory process associated with a particular law enforcement investigation, that would authorize the government to obtain the donation information here. Indeed, in this regard the Speak Freely Clause and the Private Affairs Clause fit neatly together: an "abuse" of the right to speak freely would presumably give rise to "authority of law" to arrest the abuse. Again, merely donating to a non-profit that one agrees with and supports—a hallmark of healthy civic engagement—is the antithesis of the requisite unlawful activity our courts have required to justify governmental intrusion into one's private affairs.

¶258 The majority contends "without authority of law" recognizes that the right to private affairs "may yield where state interests are sufficient to outweigh the privacy interest at stake," and "the Act itself may qualify as 'authority of law' sufficient to justify a disturbance of those affairs." *Supra* ¶¶ 111–12. Ultimately, the majority never reaches the issue of whether Plaintiffs have sufficiently alleged "authority of law," but we do not understand how the Clause could be subject to limitation by the

93

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

very laws it was designed to forbid. And what will be a "sufficient" enough state interest to outweigh a person's privacy interests? Regardless, Plaintiffs have adequately alleged at this early stage that state interests are insufficient to justify the intrusion into their private affairs, and they should be permitted to take discovery on the issue.

**¶259** "[I]n a typical facial challenge, we require the challenger to demonstrate that under no set of circumstances can the law be enforced in a constitutional manner." *AZ Petition Partners*, 255 Ariz. at 258 ¶ 17. Although this is a difficult standard to meet, this case currently stands at the 12(b)(6) motion to dismiss stage. For the reasons discussed, Plaintiffs have not "failed to state a claim upon which relief can be granted." *See* Ariz. R. Civ. P. 12(b)(6). They have met the notice pleading standard and should be allowed the opportunity to prove the substantive merits of their claim in the context of a motion for summary judgment or at trial.

### 2. As-Applied Challenge Under The Private Affairs Clause

**¶260** Plaintiffs also claim the Act is unconstitutional as applied to them under the Private Affairs Clause. In this as-applied challenge, Plaintiffs must show the law has been or is likely to be unconstitutionally applied to them. *See Smith*, 260 Ariz. at 206–07 ¶ 26; *McCullen*, 573 U.S. at 486 n.4. According to the complaint, the individual Plaintiffs donate to charitable organizations in a confidential manner because they wish to maintain their anonymity in their charitable giving. They do so because they are fearful of the risks of harassment, retaliation, and other harms to themselves and their families and employers if they are publicly identified in connection with their charitable donations.

**¶261** For the same reasons discussed above, the individual Plaintiffs have sufficiently alleged: (1) their confidential donations to non-profit organizations constitute "private affairs" that they have attempted to maintain as private; (2) they have not affirmatively and voluntarily waived their privacy protections; and (3) they have a reasonable expectation of privacy in such information. They have also sufficiently alleged a lack of "authority of law" for the government to obtain this

CENTER FOR ARIZONA POLICY v. ARIZONA SECRETARY OF STATE
JUSTICE KING, joined by VICE CHIEF JUSTICE LOPEZ and
JUSTICE BOLICK, Concurring in Part and Dissenting in Part

information.    Accordingly, the as-applied Private Affairs Clause claim was erroneously dismissed for failure to state a viable claim under Rule 12(b)(6).

## CONCLUSION

¶**262**        We agree with the majority that Plaintiffs' Speak Freely Clause as-applied claim should not have been dismissed for failure to state a claim.    But Plaintiffs' other claims under the Speak Freely and Private Affairs Clauses also should not have been dismissed.    By dismissing their claims at this preliminary stage, Plaintiffs were unjustly denied the opportunity to engage in discovery and litigate the substantive merits of their claims.    With great respect for our colleagues, we dissent.